**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Scott William MOSES, Defendant–Appellant.**

**Nos. 95–1827, 96–1789.**

United States Court of Appeals, Sixth Circuit.

Argued Sept. 15, 1997.

Decided Feb. 26, 1998.

Jennifer J. Peregord (argued and briefed), Office of U.S. Atty., Detroit, MI, for Plaintiff–Appellee.

Robert J. Dunn (argued and briefed), Midland, MI, for Defendant–Appellant.

Before: RYAN, SUHRHEINRICH, and COLE, Circuit Judges.

SUHRHEINRICH, J., delivered the opinion of the court, in which COLE, J., joined. RYAN, J. (pp. 902–05), delivered a separate concurring opinion.

## OPINION

SUHRHEINRICH, Circuit Judge.

Defendant appeals his jury conviction and sentence for abusive sexual contact and the denial of his motion for a new trial. Defendant claims among other things that the district court erred by denying his Sixth Amendment right to confrontation when it allowed a child witness to testify by closed-circuit television. We hold that the district court failed to comply with the requirements of the Child Victims' and Child Witnesses' Rights Act (the "Act"), 18 U.S.C.A. § 3509(b)(1)(B) (West Supp.1997), when it allowed a child witness to testify by closed-circuit television, and in so doing violated the Defendant's Sixth Amendment rights to confrontation. We, therefore, **REVERSE**.[1, 2]

### I.

Defendant was convicted of sexually abusing his infant niece. In December 1993, Defendant Scott Moses, a Chippewa Indian, babysat his two nieces, Amber Teachworth, then two-and-a-half years old, and Elizabeth Teachworth, then four-years old, at a location in the Saginaw Chippewa Reservation. According to police testimony, Defendant had been drinking and when Defendant changed Amber's diaper in a bedroom, he became sexually aroused and rubbed his genitals on Amber's thigh and stomach and inserted his penis in her mouth. According to Elizabeth's testimony, she walked by the room and witnessed Defendant abusing Amber. Elizabeth later reported the incident to Lisa Bollman, a social worker for the Child Protective Services of the Saginaw Chippewa Indian Tribe, who contacted the police. According to police testimony, Defendant provided a confession.

Defendant was indicted on one count of aggravated sexual abuse of a minor child in violation of 28 U.S.C.A. § 2241(c) (West Supp.1997). Before trial, the Government moved to determine Elizabeth's competency and to present her testimony on closed-circuit television as permitted under 18 U.S.C.A. § 3509 (West Supp.1997). Under § 3509(b)(1)(B), a child witness is permitted to testify by closed-circuit television if the child is fearful, would be traumatized by testifying in the presence of a defendant, is mentally impaired, or would be unable to testify because of the defendant's or defense counsel's conduct. The district court examined Elizabeth and received testimony from Lisa Bollman and Deborah Juterbock, defense counsel's investigative assistant, and found that Elizabeth was fearful and would be traumatized by testifying. The court concluded that § 3509 was satisfied and ordered that Elizabeth be permitted to testify by closed-circuit television.

At trial, defense counsel argued that Elizabeth was either mistaken, confused, fantasizing, or had been coached by either her mother or Bollman. Counsel also argued that the

---

**1.** We express no opinion on Defendant's other claims of error.

**2.** We acknowledge the concurring opinion, and accept its reasoning as additional support for reversing the district court's judgment.

real perpetrator was Garland Moses, Amber's grandfather and Defendant's father, or Amber's mother's boyfriend, Scott Morris. Alternatively, counsel argued that Defendant was either so mentally impaired or drunk that he was not capable of forming sufficient intent for criminal liability. Defendant did not testify at trial.

The district court instructed the jury on the original charge of aggravated sexual abuse of a minor child under 28 U.S.C.A. § 2241(c) and also a lesser offense of abusive sexual contact under 18 U.S.C.A. § 2244(a)(1) (West Supp.1997) The jury convicted Defendant of the lesser offense. At sentencing, the district court accepted the finding in the presentence report that Defendant had penetrated Amber and sentenced Defendant to the statutory maximum of 10 years.

Defendant moved for a new trial based on newly discovered evidence, namely that Amy Richardson, a former sitter for Amber and Elizabeth, had reported to the tribal Child Protective Services in the Spring of 1994 that Garland Moses possibly had sexually abused Amber. The prosecutor's office never disclosed the report to Defendant, even though the tribal police had custody of it. Defendant also submitted an affidavit by one of the girls' neighbors that Amber had stated that Defendant did not abuse her and that Elizabeth repeatedly had stated that she lied about Defendant at Bollman's urging. The district court denied Defendant's motion because it was highly suspicious of Elizabeth's recantation, and it concluded that the newly proposed evidence could have been discovered earlier. Defendant now purportedly proffers an affidavit of Alfreda Moses as well, which asserts that Garland Moses admitted that his son Scott is in prison for something that he, Garland, had done.

## II.

Defendant argues that the district court's determination that the requirements of § 3509(b)(1)(B) were satisfied was erroneous. The Sixth Amendment provides, in relevant part, that "[i]n all criminal prosecutions, the accused shall enjoy the right to ... be confronted with the witnesses against him." A tension arises, however, when the witness is a child who is subject to the trauma of testifying in the defendant's presence. In *Maryland v. Craig*, 497 U.S. 836, 849, 110 S.Ct. 3157, 3165–66, 111 L.Ed.2d 666 (1990), the Court balanced these two conflicting interests, noting that " 'the Confrontation Clause reflects a *preference* for face-to-face confrontation at trial,' ... a preference that 'must occasionally give way to considerations of public policy and the necessities of the case.' " *Id.* at 849, 110 S.Ct. at 3165 (citations omitted). When the witness is a child, the Court explained, "the state's interest in protecting child witnesses from the trauma of testifying" is sufficiently important to justify procedures that depart from face-to-face confrontation with the defendant. *Id.* at 855, 110 S.Ct. at 3168–69.

The *Craig* Court approved the use of closed circuit television for child witnesses upon an adequate and case-specific showing of necessity. *Id.* The Court stated that the trial court must "hear evidence and determine whether use of the one-way closed-circuit television procedure is necessary to protect the welfare of the particular child witness who seeks to testify." *Id.* In addition, the trial court must find "that the child witness would be traumatized, not by the courtroom generally, but by the presence of the defendant." *Id.* at 856, 110 S.Ct. at 3169. The trial court must find that the level of emotional distress suffered by the child witness as a result of testifying in the defendant's presence "is more than de minimus, i.e., more than 'mere nervousness or excitement or some reluctance to testify.' " *Id.* (citation omitted). However, the Court in *Craig* did not decide the minimum showing of emotional trauma necessary for the use of closed-circuit television. Rather, the Court concluded that the statute at issue, "which require[d] a determination that the child witness would suffer 'serious emotional distress such that the child cannot reasonably communicate,' Md.Code Ann. Cts. and Jud. Proc. § 9–102(a)(1)(ii)(1989), clearly suffices to meet constitutional standards." *Craig*, 497 U.S. at 856, 110 S.Ct. at 3169.

In direct response to *Craig*, Congress passed the Child Victims' and Child Witnesses' Rights Act, 18 U.S.C.A. § 3509,

which sets forth the conditions under which a child may testify by closed-circuit television. The Act states, in pertinent part:

> (B) The court may order that the testimony of the child be taken by closed-circuit television ... if the court finds that the child is unable to testify in open court in the presence of the defendant, for any of the following reasons:
>
> (i) The child is unable to testify because of fear.
>
> (ii) There is a substantial likelihood, established by expert testimony, that the child would suffer emotional trauma from testifying.
>
> (iii) The child suffers a mental or other infirmity.
>
> (iv) Conduct by defendant or defense counsel causes the child to be unable to continue testifying.

18 U.S.C.A. § 3509(b)(1)(B).[3] Section 3509(b)(1)(C) requires the court to support its "ruling on the child's inability to testify with findings on the record."

The courts of appeals have reviewed § 3509(b)(1)(B)(i) in light of the principles articulated in *Craig*. These cases consistently hold that § 3509(b)(1)(B)(i) requires a case-specific finding that a child witness would suffer substantial fear or trauma and be unable to testify or communicate reasonably because of the physical presence of the defendant. The cases hold that a general fear of the courtroom is insufficient. *See United States v. Rouse*, 111 F.3d 561, 568 (8th Cir.1997); *United States v. Quintero*, 21 F.3d 885, 892 (9th Cir.1994); *United States v. Carrier*, 9 F.3d 867. 870–71 (10th Cir.1993); *United States v. Garcia*, 7 F.3d 885, 887 (9th Cir.1993); and *United States v. Farley*, 992 F.2d 1122, 1125 (10th Cir.1993).

### A.

■ In the present case, the district court found, after the pretrial hearing, that there was a "reasonable apprehension" that Elizabeth "may be unable" to testify because of fear of being in the courtroom and because of fear of Defendant. (J.A. at 382.) The district court also found, based on Bollman's

testimony, a substantial likelihood that Elizabeth "would suffer emotional trauma from testifying" and that it would "likely impair the child's ability to communicate." (J.A. at 385.)

■ This Court reviews these factual findings for clear error. *Hernandez v. New York*, 500 U.S. 352, 364, 111 S.Ct. 1859, 1868–69, 114 L.Ed.2d 395 (1991). A finding of fact is " 'clearly erroneous' when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 541–42, 92 L.Ed. 746 (1948); *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985); *Bartling v. Fruehauf Corp.*, 29 F.3d 1062, 1067 (6th Cir.1994).

After reviewing the record, we are left with a "definite and firm conviction" that the district court mistakenly permitted Elizabeth to testify by closed-circuit television. First, Elizabeth's own testimony disavowed any fear of Defendant. When the district court interviewed Elizabeth before hearing the Government's motion, Elizabeth stated that she did not want to see Defendant because he did a "bad thing to my sister." However, Elizabeth also stated that she was not afraid of him. (J.A. at 362, 364–365). Elizabeth clearly distinguished between fear of Defendant or "Uncle Chappie," as she undisputedly referred to him, and not wanting to see Defendant, as the following colloquy illustrates:

> THE COURT: All right. Now did anybody, Elizabeth, did anybody tell you that you had to be afraid of your Uncle Chap?
>
> A: Nope, I'm not afraid of him.
>
> THE COURT: You're not?
>
> A: Nope, nope, nope, nope, nope.
>
> THE COURT: do you want to see him again:
>
> A: (Shakes head.)
>
> THE COURT: Tell me why not. Can you tell me why not?

---

**3.** Subsections (iii) and (iv) of § 3509(b)(1)(B) are not at issue in this case.

A: Because he done a bad thing to my sister.

(J.A. at 364–65.)

The district court then paradoxically accepted Elizabeth's statements that she did not want to see Defendant, but ignored her emphatic assertion that she was not afraid of him. The district court explained:

So the reaction, the observed reaction, of the child here in my private office is of some interest but it is not a particularly weighty thing in my judgment. Nor is it a weighty matter that she professes no particular fear of Uncle Chap.

The things she said that I think are most important in that regard are that she does not want to see him again, and my belief is that she was quite emphatic when she said that.

She said it a couple times and I asked her about, if I'm correct—if I was right when I heard her say that—and she, I think, was enthusiastic almost in her agreement with that principle. I asked her something about why, and she said because he had done a bad thing.

I didn't try to probe that any more than that. But it seemed to me clear that was her reason for having that, or at least stating that, desire not to see him again.

(J.A. at 377–78.) The district court seized upon the portion of Elizabeth's testimony in which she stated that she did not want to see Defendant again, and it completely disregarded Elizabeth's unequivocal assurances that she was "not afraid of him." (J.A. at 364.) Despite the Sixth Amendment's guarantee of the right to confrontation, the district court concluded that Elizabeth's unambiguous declaration was not a "weighty matter." (J.A. at 377.) This was clear error.

**B.**

■■■ We are not convinced that Bollman was a proper expert to establish the substantial likelihood of Elizabeth's trauma from testifying in open court in the presence of Defendant. Expert testimony is admissible if made by (1) a qualified expert, (2) testifying on a proper subject, (3) in conformity to a generally accepted explanatory theory, and (4) its probative value outweighs its prejudicial effect. *United States v. Kozminski*, 821 F.2d 1186, 1194–95 (6th Cir.1987); *United States v. Green*, 548 F.2d 1261, 1268 (6th Cir.1977). A witness may qualify as an expert by knowledge, skill, experience, training, or education. Fed.R.Evid. 702. The qualification of a witness to testify is a preliminary question of law. Fed.R.Evid. 104(a).

■■■ Subsection (b)(1)(B)(ii) of the Act requires *expert* testimony to establish *trauma*. Where a statute does not define a term, it receives its common meaning. *Henry T. Patterson Trust. v. United States*, 729 F.2d 1089, 1094 (6th Cir.1984). The Act does not define "expert" or "trauma." For their common meanings, we turn to The American Heritage Dictionary of the English Language (3d ed.1992). It defines "expert" as a "person with a high degree of skill in or knowledge of a certain subject." *Id.* at 645. It defines "trauma" as a psychiatric term of art meaning an "emotional wound or shock that creates substantial, lasting damage to the psychological development of a person, often leading to neurosis." *Id.* at 1904. Presumably, the expertise of a psychiatrist, psychologist, or other children's mental health specialist is required. Case law generally supports this approach. *See United States v. Weekley*, 130 F.3d 747, 752–53 (6th Cir.1997) (prosecution used a psychologist with a doctorate to show the substantial likelihood that the child witness would suffer emotional trauma); *Farley*, 992 F.2d at 1124 (prosecution also used psychologist with doctorate to establish trauma on child witness); *Garcia*, 7 F.3d at 886–87 (prosecution used both a "children's mental health specialist" and a psychiatrist); *Carrier*, 9 F.3d at 867 (prosecution used a "licensed child counselor").

The district court cautiously qualified Bollman as an expert on the basis of her experience and training, without recognizing any special skill or knowledge relating to trauma. The district court stated:

The testimony of Ms. Bollman is from a person who has had a reasonable degree of experience in dealing with children. I would say that her experience in dealing with sexually abused children is not over-

whelming. She has, however, had a fair amount of seminar training over the past several years concerning just this kind of matter, interrogation techniques and the like. So I think that her degree of experience is sufficient to reasonably call her experienced in her field and sufficient to provide opinion evidence in that way.

(J.A. at 379.)

As the district court noted, the record reflects that Bollman is an experienced social worker, who has worked with abused children and attended seminars on child abuse and related investigatory and interviewing techniques. However, the record simply does not reflect that Bollman has any "special skill or knowledge" generally relating to trauma. In addition, we note that despite all of her work with abused children, Bollman has gone to court only twice, and only one case involved child sexual abuse. (J.A. at 338–39.)

Moreover, the record does not reflect whether Bollman was an officially certified social worker. For example, the State of Michigan, in which the Saginaw Chippewa Indian reservation is located, registers and regulates three classifications of social service providers: a social work technician, a social worker, and a certified social worker. *See* Mich. Comp. Laws Ann. §§ 339.1603–.1606 (West 1992). Michigan also defines social work as:

> the professional activity of helping an individual, group, or community enhance or restore its capacity for social functioning and creating a societal condition favorable to this goal. Social work practice consists of the professional application of social work values, principles, and techniques to helping a person obtain a tangible service; counseling an individual, family, or group; helping a community or group provide or improve social and health services; and participating in a relevant legislative process.

Mich. Comp. Laws Ann. § 339.1601(b). This statutory definition of social work does not require, or even contemplate, any expertise relating to trauma. The Act, on the other hand, anticipates the use of psychologists and psychiatrists by providing for a "multidisci-plinary child abuse team," 18 U.S.C.A. § 3509(a)(7), to render:

> (D) psychological and psychiatric diagnoses and evaluation services for the child, parent or parents, guardian or guardians, or other caregivers, or any other individual involved in a child victim or child witness case;

> (E) expert medical, psychological, and related professional testimony.

18 U.S.C.A. § 3509(g)(2). Thus, while Bollman may be an expert in social work, we do not find evidence in the record that she qualifies as an expert for purposes of rendering a psychological or psychiatric opinion under § 3509(b)(1)(B)(ii).

 In addition, Bollman's testimony only marginally supports the district court's conclusion that Elizabeth would be unable to testify because of her fear of Defendant. Bollman opined that Elizabeth was afraid to testify in court. However, Bollman did not testify that Elizabeth had a particularized fear of Defendant, which the Act requires. Rather, Bollman explained that:

> [F]or a five year old adults are a power figure. They—she has no control in her life, adults feed her, clothe her, teach her. And with a family member, Scott who she was close to, and the feeling within the family now, it would be very emotionally traumatizing. She would be very vulnerable, I don't believe she could testify.

(J.A. at 341.)

The district court asked Bollman for details to support her conclusion that Elizabeth would suffer emotional trauma. Bollman explained that Elizabeth was close to her family, which was now divided, that Elizabeth experienced guilt feelings because she loved her Uncle Chappie but realized that she had to stop him from abusing her sister, and realized that her testimony would put Defendant in jail. (J.A. at 349–53.) However, we are unpersuaded, on the basis of this record, that Bollman was qualified to render an expert opinion on trauma or that Elizabeth would be unable to testify or reasonably communicate in Defendant's presence because of emotional trauma.

### III.

■ We now consider the possibility of harmless error. In *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), the Supreme Court articulated the harmless error rule for claims of constitutional error. The Court held that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Id.* at 24, 87 S.Ct. at 828. In *Delaware v. Van Arsdall,* 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986), the Court determined that harmless error analysis applied to Confrontation Clause violations. The Court stated:

> Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Id.* The Court further reasoned that "the correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." *Id.* at 684, 106 S.Ct. at 1438.

In *Coy v. Iowa,* 487 U.S. 1012, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988), a child sexual-abuse case decided before *Craig,* the Court held that the presence of a screen between the defendant and the child witness violated the Confrontation Clause, because it precluded face-to-face confrontation. In applying a harmless error analysis, the Court wrote:

> We have recognized that other types of violations of the Confrontation Clause are subject to that harmless-error analysis ... and see no reason why denial of face-to-face confrontation should not be treated the same. An assessment of harmlessness cannot include consideration of whether the witness' testimony would have been unchanged, or the jury's assessment unaltered, had there been confrontation; such an inquiry would obviously involve pure speculation, and harmlessness must therefore be determined on the basis of the remaining evidence.

*Coy,* 487 U.S. at 1021–22, 108 S.Ct. at 2803–04 (citation omitted).

In the present case, considering the "damaging potential" as "fully realized," as the Court directed in *Van Arsdall,* 475 U.S. at 684, 106 S.Ct. at 1438 we cannot say that the error was "harmless beyond a reasonable doubt." *Id.* In *Van Arsdall,* the Court held that "a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination ... from which jurors ... could appropriately draw inferences relating to the reliability of the witness." *Id.* at 680, 106 S.Ct. 1431. Similarly, in the present case, if Defendant had been present during Elizabeth's testimony, the jury could have assessed Elizabeth's reliability when confronting the accused face-to-face. As it was, even without confronting the Defendant face-to-face, Elizabeth stated that someone, other than "Scott," abused Amber:

> Q (by the prosecutor) Okay, Elizabeth, we're ready to ask you some more questions, all right? Can you turn around in your chair and face this way, please. Before we just took the last break, we were asking you some questions about your Uncle Scott and some things that had happened.
>
> A: My grama—Scott didn't do it.
>
> Mr. DUNN (defense counsel): What was that?
>
> Q: What did you say, Elizabeth?
>
> A: I said my daddy—my grama—I mean Scott didn't do it.
>
> Q: Okay.
>
> Mr. DUNN: Scott didn't do it?
>
> A: I was just—
>
> Q: We were asking you some questions about your Uncle Scott, okay?
>
> A: Yeah.

Q: You told us something that you said you saw happen, okay, do you remember that?

A: Yeah.

(J.A. at 101.) Given that Elizabeth's testimony was so equivocal, the need for confrontation was critical.

■ We cannot say under *Coy* that the error was harmless based on the remaining evidence in the record. Elizabeth provided the only eye-witness testimony of the alleged oral penetration. Without her testimony, the case rests on Defendant's confession. We have reviewed the confession, and we question its reliability. We question Defendant's competence to make and understand the nature of a confession. Specifically, we note Defendant's extremely low intelligence and self-esteem, his chronic alcoholism, and his cultural inability to deal with authority, confrontation, and stress. (J.A. at 185–254.)

Accordingly, we find that Defendant was denied his Sixth Amendment right to a face-to-face confrontation when the district court permitted Elizabeth to testify by close-circuit television without complying with § 3509. Further, we simply cannot say that "the error was harmless beyond a reasonable doubt." *Van Arsdall*, 475 U.S. at 684, 106 S.Ct. at 1438. We, therefore, **REVERSE** Defendant's conviction and **REMAND** for a new trial.

RYAN, Circuit Judge, concurring.

I concur in my brother's opinion that allowing Elizabeth Teachworth to testify by closed-circuit television violated the defendant's Sixth Amendment right to confrontation, and adopt without hesitation his analysis of this constitutional error. I write separately simply to explain my own views as to why the error was not so harmless as to be ignored and why we must therefore reverse.

## I.

### A.

There is no question that when a defendant is wrongly denied his Sixth Amendment right to "a face-to-face meeting with witnesses appearing before the trier of fact," *Coy v. Iowa*, 487 U.S. 1012, 1016, 108 S.Ct. 2798, 2800–01, 101 L.Ed.2d 857 (1988), he has not been denied one of the small handful of "constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error," *Chapman v. California*, 386 U.S. 18, 23, 87 S.Ct. 824, 827–28, 17 L.Ed.2d 705 (1967); *see Coy*, 487 U.S. at 1021, 108 S.Ct. at 2803. Nonetheless, before a violation of the Confrontation Clause, or any other "federal constitutional error[,] can be held harmless, the [reviewing] court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman*, 386 U.S. at 24, 87 S.Ct. at 828. I find it noteworthy that here, the government has not even addressed the issue of harmlessness, even though, as "the beneficiary of the error," it bears a burden "either to prove that there was no injury or to suffer a reversal of [the] erroneously obtained judgment." *Id.* at 24, 87 S.Ct. at 828.

Implicit in the Court's decision in *Coy* is a recognition that applying the harmless-error standard in a denial-of-confrontation situation presents something of a conundrum. The foundation of the confrontation guarantee is

[t]he perception that confrontation is essential to fairness. . . . A witness "may feel quite differently when he has to repeat his story looking at the man whom he will harm greatly by distorting or mistaking the facts. He can now understand what sort of human being that man is." It is always more difficult to tell a lie about a person "to his face" than "behind his back." . . . [E]ven if the lie is told, it will often be told less convincingly. . . . The State can hardly gainsay the profound effect upon a witness of standing in the presence of the person the witness accuses, since that is the very phenomenon it relies upon to establish the potential "trauma" that allegedly justified the extraordinary procedure in the present case. That face-to-face presence may, unfortunately, upset the truthful rape victim or abused child; but by the same token it may confound and undo the false accuser, or reveal the child coached by a malevolent adult.

*Coy,* 487 U.S. at 1019–20, 108 S.Ct. at 2802–03 (citation omitted). In other words, the postulate is that in the absence of confrontation, a witness's story may very well be substantively different, or perhaps simply less convincing, than if the witness must face the accused—and that the differences wrought by the absence of confrontation will be detrimental to the accused. And yet, despite this rationale, a court undertaking "[a]n assessment of harmlessness cannot include consideration of whether the witness' testimony would have been unchanged, or the jury's assessment unaltered, had there been confrontation," because "such an inquiry would obviously involve pure speculation." *Id.* at 1021–22, 108 S.Ct. at 2803. Therefore, "harmlessness must ... be determined on the basis of the remaining evidence." *Id.* at 1022, 108 S.Ct. at 2803.

## B.

### 1.

Turning, then, to the evidence against Moses that remains after one puts to the side the testimony of Elizabeth Teachworth, as indeed we must for the reasons so well explained by Judge Suhrheinrich, I find that evidence to be of negligible quality and quantity. Apart from Teachworth's testimony, the only inculpatory evidence offered by the government was the testimony of officers from two different law enforcement agencies regarding Moses' oral admissions of culpability, and Moses's written confession.

To summarize that evidence, early in the day of June 30, 1994, Moses was questioned by tribal police; this was the second time they had questioned him, as on the first occasion he had denied any wrongdoing. On this occasion, however, he allegedly stated that he had taken Amber into the bedroom to change her diaper and "wipe her down," and that in the course of doing this, he got "on the bed and in a kneeling position over Amber and ... rubbed his penis on the inside of Amber's thigh and on Amber's abdomen." He also allegedly told the tribal police that "he put the head of his thing into Amber's mouth." The Michigan State Police then questioned Moses; according to Officer Simpson, one of the interrogators, Moses initially denied touching Amber, but then "began making admissions." Specifically, according to Simpson, Moses

> eventually told [Simpson that] he took Amber into his girlfriend's bedroom, he removed Amber's diaper, he unzipped his pants, exposed his erect penis, rubbed it on her privates, her stomach, her mouth.

> He told [Simpson] that he put his penis in Amber's mouth.

> [Simpson] asked him how far, and he did a distance of ... approximately an inch. Then he put his fingers in the mouth, said this much....

> [Simpson] asked him how long this incident occurred, he said about five to six minutes, until Elizabeth ... came into the room where this was occurring and made the statement: What are you doing with my sister.

> Mr. Moses told [Simpson] that he just put his pants back on and went back out in the living room.

When asked by Simpson, Moses wrote and signed a confession that read as follows:

> Me and Abmer was in The Bed room I had my Thing on Abmer & thing Eleabuth came in The room Thing we Quit and went in the Live room & my gril freind came home.

Simpson testified that he asked some questions to clarify this statement; underneath Moses's writing is the following, written by Simpson:

> Q—Is your thing your penis?

> A—Yes.

> Q—Did you put your penis in her mouth?

> A—Yes.

> Q—Did you rub your penis on Amber's leg, chest and mouth?

> A—Yes.

### 2.

The majority concludes that the admission of Teachworth's testimony was not harmless in this context because it "question[s the] reliability" of the confessions—a conclusion it reaches based on certain social-science testimony presented by the defendant, to the

effect that Native Americans are, as a group, unable "to deal with authority, confrontation, and stress." (Maj. op. at p. 902.) I find the majority's conclusion troubling. Concededly, the confession evidence is weak; Moses's written confession is ambiguous at best, and only minimally consistent with the testimony regarding his oral confession. I note, however, that Moses did not challenge the admissibility of either the oral or written confession in the district court, and makes no such challenge in this appeal. It seems to me, therefore, inappropriate for this court to pass on the reliability of the confessions.

And it is unnecessary for the court to do so. The government's evidence, once the unconstitutionally admitted testimony is set aside, was so insubstantial as to foreclose the conclusion that the constitutional error was harmless, *beyond a reasonable doubt.* As I have said, apart from Teachworth's testimony, the only evidence the government introduced tending to show that Moses committed the crime charged was his own confession. But it has been indisputably established, in a long line of Supreme Court and Sixth Circuit cases, that a defendant's confession, uncorroborated and standing alone, is not an adequate foundation for conviction. In *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), for example, the Court discussed the "line of ... decisions [that] establishes that criminal confessions and admissions of guilt require extrinsic corroboration." *Id.* at 488, 83 S.Ct. at 417–18.

> It is a settled principle of the administration of criminal justice in the federal courts that a conviction must rest upon firmer ground than the uncorroborated admission or confession of the accused.... [T]he requirement of corroboration is rooted in "a long history of judicial experience with confessions and in the realization that sound law enforcement requires police investigations which extend beyond the words of the accused."

*Id.* at 488–89, 83 S.Ct. at 417–18 (footnote and citation omitted). The reason underlying the principle is akin to the Fourth Amendment exclusionary rule:

> "In our country the doubt persists that the zeal of the agencies of prosecution to pro-

tect the peace, the self-interest of the accomplice, the maliciousness of an enemy or the aberration or weakness of the accused under the strain of suspicion may tinge or warp the facts of the confession. Admissions, retold at a trial, are much like hearsay, that is, statements not made at the pending trial. They had neither the compulsion of the oath nor the test of cross-examination."

*Id.* at 489, 83 S.Ct. at 418 (citation omitted). The rule is, nevertheless, distinct from the wholesale disallowance of involuntary confessions:

> [A]lthough separate doctrines exclude involuntary confessions from consideration by the jury, further caution is warranted because the accused may be unable to establish the involuntary nature of his statements. Moreover, though a statement may not be "involuntary" within the meaning of this exclusionary rule, still its reliability may be suspect if it is extracted from one who is under the pressure of a police investigation—whose words may reflect the strain and confusion attending his predicament rather than a clear reflection of his past.

*Smith v. United States,* 348 U.S. 147, 153, 75 S.Ct. 194, 197–98, 99 L.Ed. 192 (1954) (citations omitted).

Corroboration of a confession through extrinsic evidence that either " 'fortifies the truth of the confession' " or " 'independently establish[es] the crime charged' "—in older parlance, the *corpus delicti*—is therefore required before a conviction may be validly obtained. *Wong Sun,* 371 U.S. at 489, 83 S.Ct. at 418 (citation omitted). *See generally Smith,* 348 U.S. 147, 75 S.Ct. 194, 99 L.Ed. 192; *Opper v. United States,* 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101 (1954); *United States v. Marshall,* 863 F.2d 1285 (6th Cir.1988). Both varieties of corroborative evidence are lacking here.

To be sure, there is one item of evidence that could conceivably be viewed as corroborative. That is the testimony of Lisa Bollman, the social worker who interviewed Elizabeth Teachworth regarding the suspected abuse of Amber Teachworth. However, the government did not call Bollman as a wit-

ness; strangely enough, Moses did. And it was Moses's counsel who elicited the following hearsay testimony:

Q You asked Elizabeth what happened, Elizabeth said to you Uncle Scott showed his ding-ding; is that right?

A Correct.

Q You then asked Elizabeth who she—who he showed his ding-ding to and Elizabeth stated my sister.

A Correct.

Q At one point Elizabeth put her hand on her throat when you asked where Uncle Scott put his ding-ding; is that correct?

A Correct.

This testimony appears to me to be inadmissible hearsay, not subject to any exception. For obvious reasons, its admission was not objected to by the government. And similar testimony, to which the defendant in turn did not object, was elicited by the government in its cross-examination.

But even if Bollman's testimony were sufficiently corroborative to support the conviction—and concededly, the hurdle is low—that does not mean that the introduction of Elizabeth Teachworth's testimony was harmless. That is, even if the government presented sufficient evidence independent of Elizabeth's unconstitutional testimony to uphold Moses's conviction under the "any rational trier of fact" standard imposed by *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), there can be no serious question that the evidence was no more than barely sufficient. I find it highly probable, in short, that Teachworth's dramatic, damaging, and unconfronted testimony tipped the scales in favor of a conviction. Accordingly, it is plain to me that the constitutional error in admitting the child's testimony was not harmless beyond a reasonable doubt.

## II.

To recapitulate then, there were three pieces of evidence in this trial that tended to show that Moses committed the crime with which he was charged: the unconstitutionally admitted testimony of Elizabeth Teachworth; the inadmissible, but not objected to, hearsay testimony regarding Teachworth's incrimina-

ting statements to Bollman; and the defendant's confession. Without expressing an opinion as to the sufficiency of the evidence to convict Moses, since that is not an issue before us, I am compelled to conclude that in the context of such an otherwise-insubstantial case for the prosecution, the admission of Teachworth's testimony was not harmless beyond a reasonable doubt. I concur, therefore, in the judgment reversing Moses's conviction.