**Opinion issued February 3, 2015**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NOS. 01-13-00739-CR, 01-13-00740-CR, 01-13-00741-CR, 01-13-00742-CR

_____

**BENNY JOSEPH WALKER, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 21st District Court**
**Washington County, Texas**
**Trial Court Case Nos. 16,407, 16,408, 16,409, & 16,410**

---

## O P I N I O N

Benny Joseph Walker appeals from his convictions on two counts of super-aggravated sexual assault of a child (cause numbers 16,407 and 16,409), one count of aggravated sexual assault of a child (cause number 16,408), and 125 counts of possession of child pornography (cause number 16,410). Walker argues that

various evidence was improperly admitted, entitling him to reversal and remand for a new trial. We affirm.

## Background

In 2012, Stacie Aguilar lived in Rockdale, Texas, with her husband and their four children. Among those children were KBA, a six year–old girl, and AJA, a four year–old girl.[1] Aguilar's father, Larry Reed, lived in Duncanville, Texas, with his wife, Sharon, and Sharon's fifteen year–old son—Aguilar's step-brother—Paul Proudfoot. Aguilar and Paul were close, and Aguilar's children viewed Paul as their uncle.

In 2012, Walker had been married to Aguilar's mother, Carolyn, for several years. KBA and AJA called Walker "Grandpa Ben." Carolyn worked outside the home at nights, from 10 P.M. to 6 A.M., but Walker was unemployed. Whenever Aguilar's children stayed at Walker and Carolyn's home, Walker was their sole caretaker while Carolyn was at work.

Aguilar and her children traveled to the home of Larry and Sharon Reed for Father's Day weekend in June 2012. While they were there, KBA told Paul, "I've touched Grandpa Ben's privates," that AJA had done the same, and that Walker had "licked [KBA's] privates." Paul told Aguilar what KBA had said, and Aguilar

---

[1] KBA and AJA are pseudonyms given to the two child victims by law enforcement. Because their identities and relationship to Walker are not at issue, we will use the pseudonyms to refer to the children.

then asked KBA whether her statement was true; KBA stated that it was. KBA and AJA each told Aguilar that Walker had "licked" both KBA's and AJA's "privates" and that, at Walker's request, both girls had sucked on Walker's "private."[2] Both KBA and AJA testified at trial to these events. In addition, Jane Riley, a certified pediatric nurse practitioner who conducted separate physical examinations of KBA and AJA on June 21, 2012, testified that the girls repeated the same facts to her. KBA told Riley that the abuse occurred on multiple occasions, and AJA testified that similar abuse had occurred on multiple occasions.

Aguilar reported the girls' statements to the Child Protective Services division of the Texas Department of Family and Protective Services and the Washington County Sheriff's Office. In the resulting investigation, officers with the sheriff's office, acting under Carolyn's written consent, seized a computer that Walker and Carolyn co-owned and kept in their home. On it, the investigators found 125 photographs depicting sexual activity by persons under the age of 18 years. A person logged into the computer under the username "Ben" viewed these photographs on the evening of June 24, 2012, two days before Walker's arrest. Carolyn testified that she used the computer only to enter her time for work and to play games.

---

[2]  Aguilar testified that KBA used the word "private" to refer to genitalia.

Aguilar contacted Lynette Guerra, a licensed professional counselor who specializes in working with child victims of physical abuse, sexual abuse, and neglect. Guerra began counseling KBA and AJA in September 2012 and continued counseling them through the time of trial. With the exception of a brief period during which Guerra received a cancer diagnosis, she conducted the counseling sessions in person, either at her office or at Aguilar's home. Guerra also spoke with the girls more informally, meeting them at school or talking to them on the phone.

Before trial, the State moved to allow KBA and AJA to testify via closed-circuit television (CCTV), which Walker opposed. The trial court held a hearing on the motion at which Aguilar and Guerra testified in support of the State's motion; Walker presented no evidence at the hearing. The trial court granted the motion, and KBA and AJA testified at trial via CCTV.

A jury found Walker guilty of all charges and assessed punishment for each of the three assault charges as the imposition of a $10,000 fine and incarceration for a term of 75 years, and for each of the 125 child pornography charges as a $1,000 fine and incarceration for a term of 4 years. The trial court entered judgment on the jury's verdict, ordering that the three 75-year sentences be served consecutively, but that the 125 4-year sentences be served concurrently.

Walker raises four arguments on appeal, each of which he contends requires reversal and remand for a new trial. First, he argues that the trial court abused its discretion by permitting a psychologist who had not examined KBA, AJA, or Walker to testify regarding behaviors exhibited by those individuals. Second, he argues that the trial court improperly allowed the children to testify via closed-circuit television based on Guerra's testimony because Guerra lacked the education, experience, and contact with the children necessary to opine on whether the trial court should allow the children to testify via CCTV. Third, he contends that Guerra, KBA, and AJA violated "the Rule" when Guerra met with the girls after a pretrial hearing at which the Rule was invoked. Finally, he argues that the trial court abused its discretion in allowing Aguilar to testify as an "outcry" witness.

## Psychologist Testimony

In his first issue, Walker argues that the trial court erred by permitting a clinical psychologist, Lawrence Thompson, Jr., Ph.D., to testify as an expert witness regarding behaviors exhibited by Walker, KBA, and AJA. Dr. Thompson has experience working with adult child abusers and with child abuse victims, but has never examined Walker, KBA, or AJA. Dr. Thompson testified that KBA and AJA exhibited behaviors consistent with child abuse, such as sexual acting-out. He testified that he could not testify whether Walker is or is not a sex offender, but

noted that some of Walker's behaviors, such as blaming others and rationalizing his actions, were consistent with the behavior of sex offenders. Walker complains that the trial court erred by permitting Dr. Thompson to offer this testimony because Dr. Thompson was not qualified to give it without first examining Walker, KBA, or AJA.

The State responds that Walker has not preserved his arguments for appeal because those arguments do not correspond to his objections at trial. We agree.

Rule 33.1(a) of the Texas Rules of Appellate Procedure requires a defendant to preserve complaints for appeal by making a timely request, objection, or motion to the trial court that is sufficiently specific to make the trial court aware of the complaint, unless it is apparent from the context, and that complies with the Rules of Evidence. TEX. R. APP. P. 33.1(a). In the context of a criminal case, this means that

> [t]o preserve a complaint for appellate review, a defendant must make a timely, specific objection to the trial court. It follows that an objection stating one legal basis may not be used to support a different legal theory on appeal. Courts have routinely held that where a complaint on appeal does not comport with an objection made at trial, the error is not preserved on the complaint. An objection is sufficient to preserve error for appellate review if the objection communicates to the trial judge what the objecting party wants and why the objecting party thinks himself entitled to relief. To preserve error where objectionable testimony is involved, a party must object every time the allegedly inadmissible testimony is offered.

*Rios v. State*, 263 S.W.3d 1, 5 (Tex. App.—Houston [1st Dist.] 2005, pet. dism'd, untimely filed) (citations omitted); *see also Martinez v. State*, 22 S.W.3d 504, 507 (Tex. Crim. App. 2000).

At trial, Walker objected that Dr. Thompson should not be permitted to testify as to issues of adult clinical psychology or regarding facts specific to this case, but should be limited to testimony regarding concepts and methods of child psychology. The trial court overruled the objection during a bench conference, although it asked the State to qualify Dr. Thompson more fully as an expert in adult psychology in front of the jury. The State did so. The trial court also informed Walker's counsel that the court could not rule on an abstract objection that Dr. Thompson had relied upon facts that should not be mentioned before the jury; rather, Walker would need to object to such issues as they came up. During subsequent testimony, Walker's counsel again objected to Thompson's qualifications as an expert in the psychology of adults, but noted, "I don't object to his qualifications as an expert in regard to the child [sic] in this case." The trial court then found Dr. Thompson qualified to testify as an expert regarding both Walker and the children.

Dr. Thompson proceeded to testify regarding behaviors characteristic of child abusers and their victims, but Walker did not object to the majority of this testimony. When Walker did object, it was to testimony about the prospects for

treatment of perpetrators of child sexual abuse; Walker objected that such testimony was relevant to the punishment phase of the trial, but not the guilt-innocence phase. The trial court sustained this objection and instructed the jury to disregard the testimony, but denied Walker's motion for a mistrial.

Dr. Thompson also testified regarding his examination of KDA's and AJA's case histories, stating that he found indicators of sexual abuse in the girls' behavior. Walker apparently objected to the substance of Dr. Thompson's testimony regarding KBA at one point, but neither the substance of the objection nor the court's ruling thereon are preserved in the record.[3] Dr. Thompson then testified regarding his examination of Walker's case history, stating that he found behaviors sometimes associated with sex offenders. Walker did not object to this testimony. Rather, on cross-examination, Walker's counsel drew out still more of the factual background for Dr. Thompson's opinions.

At no point did Walker object to Dr. Thompson's testimony on the same grounds raised in his first issue on appeal: that Dr. Thompson was unqualified to testify because he had not personally examined Walker, KBA, or AJA. He has therefore waived any error in the admission of Dr. Thompson's testimony

---

[3]     Dr. Thompson testified that he found "some concerning things [in documents related to KBA's behavior], some things that are consistent with kids that have been abused." The record reflects only that Walker objected to this testimony and asked to approach the bench, at which point the trial court held a bench conference off the record; the record contains no rulings or jury instructions related to this objection.

regarding those individuals. *See* TEX. R. APP. P. 33.1(a); *Martinez*, 22 S.W.3d at 507; *Rios*, 263 S.W.3d at 5.

## CCTV Testimony

In his second issue, Walker argues that the trial court improperly allowed KBA and AJA to testify via CCTV based on testimony by Lynette Guerra, the licensed professional counselor who examined both girls. According to Walker, use of CCTV testimony in this case deprived him of his rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution.

## A. Standard of Review

The Confrontation Clause guarantees a criminal defendant the right "to be confronted with the witnesses against him." U.S. CONST. amend. VI. The Confrontation Clause is incorporated against the States by the Fourteenth Amendment. *Pointer v. Texas*, 380 U.S. 400, 406, 85 S. Ct. 1065, 1069 (1965).

The Sixth Amendment, however, "reflects a *preference* for face-to-face confrontation at trial" and is not absolute. *Maryland v. Craig*, 497 U.S. 836, 849, 110 S. Ct. 3157, 3165 (1990) (quoting *Ohio v. Roberts*, 448 U.S. 56, 63, 100 S. Ct. 2531, 2537 (1980)). At times, that preference must "give way to considerations of public policy and the necessities of the case." *Id.* (quoting *Mattox v. U.S.*, 156 U.S. 237, 242–43, 15 S. Ct. 337, 339–340 (1895)).

When a child testifies about certain offenses, Texas law permits a trial court to order, on its own motion or on a motion of the State or the defendant's attorney, that the child's testimony shall be taken in a room other than the courtroom and displayed to the jury and defendant via CCTV. TEX. CODE CRIM. PROC. ANN. art. 38.071, § 3 (West Supp. 2014). Aggravated sexual assault is such an offense. *Id.* § 1(8). When a child testifies in this manner, the CCTV feed must be viewable by the court and the finder of fact. *Id.* § 3(a). The defendant must be able to observe and hear the child's testimony and communicate contemporaneously with his attorney, "but [the court] shall attempt to ensure that the child cannot hear or see the defendant." *Id.*

The Supreme Court of the United States has held that a trial court may admit CCTV testimony of a child, if the trial court determines that (1) the use of the procedure is necessary to protect the welfare of the child witness; (2) the child witness would be traumatized by the presence of the defendant; and (3) the trauma would be "more than *de minimis*, *i.e.*, more than 'mere nervousness or excitement or some reluctance to testify.'" *Craig*, 497 U.S. at 855–56, 110 S. Ct. at 3169 (quoting *Wildermuth v. State*, 530 A.2d 275, 289 (Md. 1987)).

## B. Analysis

Walker objected at trial that Guerra's testimony in support of CCTV testimony was unreliable. Specifically, Walker argued that Guerra had never

testified on the topic before and was unqualified to do so, that the children's fear was caused by statements of Aguilar and Guerra, and that Guerra had not investigated the children's fears adequately. The trial court granted the motion to permit CCTV testimony, noting that it had never granted such a motion before, but that the procedure was necessary and appropriate in this case to "protect[] a five- and a seven-year old from [the] traumatic effects of testifying."[4]

As a threshold matter, we note that Walker's assertion that the trial court heard testimony only from Guerra is incorrect. Aguilar also testified at the hearing on the motion. Aguilar testified that KBA has become "very quiet" since disclosing the abuse, has had nightmares, and was afraid that Walker would "spank [the girls], because that's what he had told them" he would do. She testified that AJA "doesn't want to see [Walker] because she's scared that he is going to hurt her." Aguilar also confirmed that both girls were "afraid" of Walker and specifically asked questions about their testimony like, "[W]hat will we have to do, and will we have to see [Walker]?" When Aguilar told them that the possibility existed that they might "have to speak in front of [Walker]," "they [got] kind of apprehensive and [told] me they don't want to see him, that they're scared."

We therefore disagree with Walker's assertion that the trial relied entirely on Guerra's testimony in ordering the use of CCTV. Aguilar's testimony regarding

---

[4] Walker does not argue that the trial court failed to make sufficient findings under *Craig* or any other standard.

11

the girls' fears of Walker was sufficient to demonstrate that use of CCTV was necessary, seeing Walker in court would traumatize the girls, and the trauma would be significant, as required by *Craig*. *See* 497 U.S. at 855–56, 110 S. Ct. at 3169.

Walker cites no controlling authority for the proposition that the trial court's order permitting CCTV testimony must be based on testimony of a qualified expert, as opposed to the children's mother. Instead, he relies on *United States v. Moses*, 137 F.3d 894 (6th Cir. 1998) and *State v. Bray*, 535 S.E.2d 636 (S.C. 2000), in which appellate courts found that trial courts erred in permitting CCTV testimony. *Moses*, 137 F.3d at 898; *Bray*, 535 S.E.2d at 639–40. In *Moses*, the trial court asked the child witness if she was afraid of the defendant. 137 F.3d at 898. She responded, "Nope, nope, nope, nope, nope." *Id.* When asked why she did not want to see him, she testified, "Because he done a bad thing to my sister." *Id.* at 898–99. The Sixth Circuit held that, under these facts, the trial court erred in permitting the witness to testify via CCTV. *Id.* at 898, 902. In *Bray*, a counselor with a master's degree in social work examined the child victim and testified that the victim would likely be unable to testify at all in open court in front of the accused. 535 S.E.2d at 639. The Supreme Court of South Carolina held that sufficient evidence supported the use of CCTV, but the trial court nonetheless erred by failing to make case-specific findings required by prior South Carolina

precedent. *Id.* at 639–40. *Moses* and *Bray* thus do not support Walker's assertions in this case.

Walker contends that Guerra was not qualified to testify in favor of using CCTV: he argues that, "by virtue of lack of education, experience, and/or insufficient contact, [she] is simply not qualified to render an opinion upon which a court should rely as its basis for its decision." But he does not cite to the record or to authority for the proposition that such qualifications are even necessary or that Guerra was unqualified. Contrary to Walker's arguments, Guerra based much of her testimony on personal knowledge, and her testimony corroborated Aguilar's testimony that CCTV was necessary. Guerra testified that she had met with the girls repeatedly in her capacity as their counselor. She also testified that the girls had nightmares related to the abuse and that AJA had "woken up with a nightmare that [Walker] was coming to get her; crying." She explained that KBA had developed "a nervous habit of licking her lips, to the point . . . [that] it was constantly chapped on her chin." Guerra also testified that KBA would only whisper when she first met with her, would "revert to baby talk when she wasn't wanting to answer a question," and "gets very anxious and will revert back to the whisper and the baby talk when we talk about" her testimony in court. Guerra was concerned that KBA's nightmares, anxiety, and stress behaviors would only increase when she had to come to court. Likewise, AJA would often only whisper

when Guerra asked her certain questions and sometimes would "just shut down and not respond at all" when talking about the abuse.

Guerra explained that the girls' worst concerns centered on Walker's presence in the courtroom: "Those would be the points when both girls would just totally shut down and wouldn't communicate." She concluded that forcing the girls to give their testimony in front of Walker "would be very traumatic" and would cause them to regress psychologically; the stress they would experience would be "over the top," much greater than the normal anxiety one might feel about testifying in court.

We hold that the record contains sufficient evidence to demonstrate that CCTV testimony was appropriate under the Sixth Amendment, the test set forth in *Craig*, and Article 38.071 of the Code of Criminal Procedure. The testimony of Aguilar and Guerra was sufficient to demonstrate that such testimony was necessary to protect the girls' psychological health, and supports the trial court's finding that CCTV was necessary to protect them from trauma.

We overrule Walker's second issue.

### Violation of the Rule

Walker argues in his third issue that a violation of the witness-sequestration rule, generally known as "the Rule," precluded KBA and AJA from testifying. Texas Rule of Evidence 614 states: When a party or the trial court itself invokes

14

the Rule, the trial court "shall order witnesses excluded so that they cannot hear the testimony of other witnesses." TEX. R. EVID. 614. Walker argues that the trial court placed Guerra under the Rule at a pretrial hearing, but Guerra violated the Rule when she spoke with KBA and AJA about the facts of the case after that hearing and before the girls testified. According to Walker, this violation required the trial court to strike the girls' testimony.

## A. Standard of Review

We review a trial court's decision to admit testimony of a witness who violates the witness-sequestration rule for abuse of discretion. *Bell v. State*, 938 S.W.2d 35, 50 (Tex. Crim. App. 1996); *Martinez v. State*, 186 S.W.3d 59, 65 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd). In reviewing such a decision, "we determine whether the appellant was harmed or prejudiced by the witness's violation." *Martinez*, 186 S.W.3d at 65 (citing *Bell*, 938 S.W.2d at 50). "Harm is established by showing that (1) the witness actually conferred with or heard testimony of other witnesses and (2) the witness's testimony contradicted the testimony of a witness from the opposing side or corroborated testimony of a witness she had conferred with or heard." *Id.* (citing *Bell*, 938 S.W.2d at 50). One effect of the second prong of this test is that the complaining party must show that what the witness improperly heard influenced or at least "colored" her testimony. *Bell*, 938 S.W.2d at 50–51; *Martinez*, 186 S.W.3d at 66.

**B.      Analysis**

By its terms, Rule 614 only requires the trial court to "order witnesses excluded so that they *cannot hear the testimony* of other witnesses." TEX. R. EVID. 614 (emphasis added). In a criminal case, the Rule's purpose is to prevent one witness's testimony from being "materially affected if the witness hears other testimony at the trial." TEX. CODE CRIM. PROC. ANN. art. 36.03(a) (West 2007). Accordingly, "[a]t the commencement of a trial, the court shall admonish each witness who is to testify as to those persons whom the court determines the witness may talk to about the case before the trial ends *and those persons whom the witness may not talk to about the case*." *Id.* art. 36.03(e) (emphasis added). The purpose of the Rule is "preventing witnesses from hearing and being informed as to the *testimony* of other witnesses." *Creel v. State*, 493 S.W.2d 814, 820 (Tex. Crim. App. 1973) (emphasis added) (citing predecessor statute to TEX. CODE CRIM. PROC. ANN. art. 36.03(a)). "The Rule has no application to the exclusion of witnesses during voir dire of jurors and before any testimony on the trial has begun." *Id.*; *see also Coons v. State*, 758 S.W.2d 330, 336 (Tex. App.—Houston [14th Dist.] 1988, pet. ref'd) (trial court erred by excluding witness based on alleged communication with complainant in separate case before invocation of the Rule at trial).

16

The record indicates that Walker's counsel invoked the Rule at a pretrial hearing on July 17, 2013. The trial court admonished the witnesses present—Sharon Reed, Aguilar, and Guerra—as follows:

> All right. So the Rule has been invoked for today, which means that you all have to stay outside of the room where we're doing the testimony. You're not to discuss *with each other* what you're going to talk about. When you leave the room, you're not supposed to tell *each other* what you did say. It's permissible and acceptable for you to speak individually with the attorneys, but not as a group, until I remove these rules from you, okay? All right. Thank you. If y'all want to step on out.

(emphasis added).

During the summer of 2013, Guerra met with KBA and AJA four times to prepare them to testify in court. Two of these meetings occurred after the pretrial hearing. Guerra testified, however, that she never told the girls "what to say in court," "put words in their mouth[s]," or told them "how to react to questions." Rather, she spoke with them about "how to speak loudly and clearly, the importance of that; the importance of telling the truth, that type of thing." They discussed "[m]ore behaviors of how to talk in front of other people, not what to say." She emphasized, "I did not discuss testimony" with the girls, but focused on the use of CCTV, who might be in the room when the girls testified, and the fact that various adults would ask the girls questions, which they needed to answer truthfully. KBA testified on the fourth day of trial that she talked with Guerra "about coming here . . . to testify," and that her most recent meeting with Guerra

17

occurred "I think the day before yesterday." KBA testified that they talked at that meeting "[a]bout court and coming here, and about what [Walker] did to—to me and [AJA], a little bit about that."

Even if we were to assume that Guerra and KBA spoke about the substance of KBA's testimony after Guerra was placed under the Rule at the hearing, Walker has failed to demonstrate that the trial court abused its discretion in permitting KBA and AJA to testify. The trial court was free to believe Guerra's testimony that she did not discuss testimony with KBA after the hearing and before trial. And, to show such an abuse, Walker must show "that (1) the witness actually conferred with or heard testimony of other witnesses and (2) the witness's testimony contradicted the testimony of a witness from the opposing side or corroborated testimony of a witness she had conferred with or heard." *Martinez*, 186 S.W.3d at 65 (citing *Bell*, 938 S.W.2d at 50). Walker has shown neither. On the contrary, the most that we could conclude from the record is that KBA—whom the trial court did not place under the Rule at the pretrial hearing—spoke to Guerra, her counselor, about the substance of *KBA's* testimony, not Guerra's. Walker also fails to show that Guerra's post-hearing conversation with KBA had any influence, conscious or otherwise, on any witness's testimony. *See Bell*, 938 S.W.2d at 50–51; *Martinez*, 186 S.W.3d at 66.

18

We hold that the trial court did not abuse its discretion in permitting KBA and AJA to testify. We therefore overrule Walker's third issue.

**Hearsay Testimony**

In his fourth issue, Walker argues that the trial court abused its discretion in permitting Aguilar to testify as an outcry witness regarding hearsay statements by KBA and AJA. Hearsay is generally inadmissible. TEX. R. EVID. 802. But Texas law permits an adult to testify about hearsay statements by a child who is a victim of an assault, subject to certain substantive and procedural requirements. TEX. CODE CRIM. PROC. ANN. art. 38.072 (West Supp. 2014). Walker argues that Aguilar's testimony about KBA's and AJA's outcry statements was inadmissible because those statements were unreliable under the circumstances.

**A. Standard of Review**

We review a trial court's admission of outcry testimony under Article 38.072 under an abuse of discretion standard. *Garcia v. State*, 792 S.W.2d 88, 92 (Tex. Crim. App. 1990).

**B. Analysis**

Article 38.072 of the Texas Code of Criminal Procedure exempts from the hearsay rule certain statements made by a child 14 years of age or younger or a person with a disability who is the victim of certain offenses, including sexual assault. TEX. CODE CRIM. PROC. ANN. art. 38.072. To be admissible in the guilt-

innocence phase of a trial, the statement must describe the alleged offense and be made by the person against whom the act was committed. The witness testifying about the outcry also must be "the first person, 18 years of age or older, other than the defendant, to whom the child or person with a disability made a statement about the offense . . . ." *Id.* § 2(a).

The trial court must find "in a hearing conducted outside the presence of the jury, that the statement is reliable based on the time, content, and circumstances of the statement." *Id.* § 2(b)(2). As the Texarkana court of appeals has explained,

> [i]ndicia of reliability that the trial court may look to include (1) whether the victim testifies at the trial and admits making the out-of-court statement; (2) whether the child is of a level of maturity to understand the need to tell the truth and to have the ability to observe, recollect, and narrate; (3) whether the child's out-of-court statement is corroborated by other evidence; (4) whether the child's out-of-court statement was spontaneously made in the child's own terminology or whether there is evidence of prior prompting or manipulation by adults; (5) whether the child's out-of-court statement is clear and unambiguous and rises to the needed level of certainty; (6) whether the statement is consistent; (7) whether the statement describes an event that a child of his or her age could not be expected to fabricate; (8) whether there is abnormal behavior by the child after the contact; (9) whether there is a motive for the child to fabricate the out-of-court statement; (10) whether the statement is against the interest of the child, e.g., the child expects punishment because of reporting the conduct; and (11) whether there was an opportunity under the evidence for the alleged act to have been committed by the defendant.

*Buckley v. State*, 758 S.W.2d 339, 343–44 (Tex. App.—Texarkana 1988) (footnote omitted), *aff'd*, 786 S.W.2d 357, 361 (Tex. Crim. App. 1990).

According to Walker, the trial court erred in allowing Aguilar to testify as the outcry witness under Article 38.072 because Aguilar "confronted the children . . . in an attempt to elicit the same details" after learning that the girls had reported the abuse to Paul. Walker concludes that the outcry to Aguilar was unreliable because it was not "spontaneous . . . in the children's own language and made by their own initiative, . . . [but] was totally as a result of Aguilar's prompting and/or manipulation." The record does not support Walker's argument.

Aguilar testified about the first time KBA and AJA told her about the abuse. The first time she spoke with KBA about it, inside Sharon Reed's home with Paul Proudfoot present, Aguilar asked KBA, "Is this true?" KBA was concerned that Aguilar would be mad, but Aguilar reassured her that she just wanted to know the truth. KBA confirmed that the facts she reported to Paul were true. Aguilar later asked KBA to come outside with her and, with Sharon Reed present, asked, "[W]hat happened?" At that point, KBA repeated what she had told Paul. Aguilar sent KBA back inside and asked AJA to come outside. Aguilar asked AJA what had happened, but AJA did not respond. Aguilar asked, "Did anything happen at Grandpa Ben and Nanny's house?" AJA was also worried that she would be in trouble and that Aguilar would be mad, but when Aguilar assured her that was not the case, AJA told a story consistent with KBA's story. Aguilar brought KBA

back outside and asked again if the story was true; KBA insisted, "[Y]es, Mom, it happened."

Aguilar's conversation with her daughters does not indicate prompting, manipulation, or coercion. Rather, both girls independently reported similar accounts when Aguilar asked what happened. In addition, many of the other indicia of reliability set out in *Buckley* indicate that the girls' outcry was reliable. The court confirmed that the girls understood the need to tell the truth and were mature enough to have the ability to observe, recollect, and narrate. Ample evidence—including hearsay testimony by Paul admitted without objection— corroborated the outcry. The out-of-court statements were clear and unambiguous, rising to the needed level of certainty. The statements were consistent; as Walker acknowledges, the outcry testimony showed that the girls' story was "devastating" in part because the story "was reasonably consistent over time, i.e. at the time of the outcry, during the investigation, and during trial." Dr. Thompson testified that, in the absence of abuse, children under the age of eight generally do not have concepts of sexual abuse, inappropriate touching, sexual intercourse, oral sexual contact, or other sexual activities, indicating that it was unlikely that the girls fabricated the story. The girls exhibited abnormal behavior after the assaults, including nightmares, whispering and speaking in baby talk, and acting out sexually with each other; KBA also had problems wetting the bed and participated

22

in an inappropriate incident involving another child on a school bus. The record reflects no motive for the girls to fabricate their statements, and undisputed evidence showed that Walker had an opportunity to commit the alleged abuse.

The record thus supports the trial court's finding that the outcry statements were sufficiently reliable to be admissible. *See Buckley*, 758 S.W.2d at 343–44. We therefore conclude that the trial court did not abuse its discretion in admitting them.

We overrule Walker's fourth issue.

## Conclusion

We affirm the judgment of the trial court.


Rebeca Huddle
Justice

Panel consists of Chief Justice Radack and Justices Bland and Huddle.

Publish. TEX. R. APP. P. 47.2(b).