Gilbert Anthony MARTINEZ,
Appellant,

v.

The STATE of Texas, Appellee.

No. 01–04–00715–CR.

Court of Appeals of Texas,
Houston (1st Dist.).

Oct. 20, 2005.

Discretionary Review Refused
May 24, 2006.

**60** 

Robert Morrow, Hocker & Morrow, Boyd & Mathews, Spring, TX, for Appellant.

Charles A. Rosenthal, Jr., District Attorney–Harris County, Alan Curry, Assistant District Attorney, Houston, TX, Appellee.

Panel consists of Justices NUCHIA, JENNINGS, and HIGLEY.

## OPINION

LAURA CARTER HIGLEY, Justice.

Appellant, Gilbert Anthony Martinez, was charged by indictment with murdering the complainant by shooting her with a deadly weapon, namely a firearm. *See* TEX. PEN.CODE ANN. § 19.02 (Vernon 2003). The jury found appellant guilty as charged and assessed punishment at confinement for life.

In five issues, appellant contends that the trial court abused its discretion in (1) admitting DNA evidence from fingernail scrapings without a proper chain of custody, (2) refusing to strike the testimony of two witnesses who spoke to one another outside the courtroom, and (3) allowing hearsay into evidence over timely objections.

We affirm.

### Background

On the night of November 2, 2000, appellant's girlfriend, the complainant April Dykes, was found shot to death in Idylwood Park in Houston. Earlier that evening, April had gone to visit a neighbor, Albert Castillo. April and Castillo went to the corner store in Castillo's car. Later, while they sat in the car and talked, appellant drove by, turned around, then parked near Castillo's car. Appellant drove a black Cadillac with a white right-front panel.

Appellant got out and approached the passenger side of Castillo's car. April ducked down in her seat to hide. Appellant saw April and told her to get out of Castillo's car while cursing at her. April hesitated, telling Castillo that she did not want to get out. Castillo told her to stay in the car, but April replied, "That's my boyfriend, I got to go." April got into appellant's Cadillac with appellant, Terrence "TJ" Brundage, and Alex Caballero, and the group headed toward Idylwood Park.

Shortly thereafter, Darryl Hickey and Sabrina Sheppard heard three gunshots from their respective homes near Idylwood Park. Hickey ran outside and saw three men running out of the park and getting into a dark-colored, older-model, four-door car with a light-colored front panel on the passenger side. Sheppard ran to the end of her driveway and saw a dark-colored vehicle with a white right-front panel at the park. She then saw three men run out of the park and get into the car. Hickey and Sheppard ran to the park and found April gasping for breath. Moments later, April died. Houston Police Sergeant Michael Peters arrived at the scene, "bagged" April's hands, and requested fingernail scrapings from the medical examiner.

The next day, Sergeant Peters received a report from Crime Stoppers that the shooter had been identified as "Gilbert Martinez." Sergeant Peters located appellant and asked him to come in and give a statement. In his statement, appellant asserted that he was not with April at the

time of the incident and did not know the circumstances surrounding her death.

April's autopsy revealed that she had been shot three times in the chest, once at close range. Among the samples submitted for DNA analysis were scrapings from under her fingernails. The analysis indicated that appellant could not be excluded as a possible contributor to the material recovered from April's fingernails.

In January 2001, appellant told his ex-girlfriend Monica Parra that April was killed in his car during a drive-by shooting. When Parra continued to question him as to why there were no bullet holes in his car, appellant admitted that he killed April.

In November 2001, appellant began dating Maya Blakely. Blakely asked appellant multiple times about April's death over the course of several months. Appellant first asserted that she was killed by a jealous boyfriend. Eventually, appellant confessed that he shot April, and he took Blakely to Idlywood Park to show her where it occurred. Blakely contacted police, and appellant was arrested.

### Chain of Custody

In his first issue, appellant contends that the "trial court abused its discretion in admitting DNA testimony concerning fingernail scrapings, when the chain of custody of those scrapings was not proven."

### A. Standard of Review and Applicable Law

The standard of review for a trial court's ruling under a rule of evidence is abuse of discretion. *Weatherred v. State,* 15 S.W.3d 540, 542 (Tex.Crim.App.2000). A trial court abuses its discretion when it acts without guiding rules or principles. *Montgomery v. State,* 810 S.W.2d 372, 380 (Tex.Crim.App.1991). We review the trial court's ruling in light of what was before

the trial court at the time the ruling was made and uphold the trial court's judgment if it lies within the zone of reasonable disagreement. *Weatherred,* 15 S.W.3d at 542.

As a condition precedent to the admission of evidence, the trial court must be satisfied that the evidence offered is what the proponent claims. TEX.R. EVID. 901(a); *Angleton v. State,* 971 S.W.2d 65, 67 (Tex. Crim.App.1998). This can be accomplished by testimony from a witness with knowledge that an item is what it is claimed to be. TEX.R. EVID. 901(b)(1). The authentication requirement for admissibility is met once the State has shown the beginning and the end of the chain of custody, particularly when the chain ends at a laboratory. *Gallegos v. State,* 776 S.W.2d 312, 315–16 (Tex.App.-Houston [1st Dist.] 1989, no pet.). Any gaps and minor theoretical breaches go to the weight rather than the admissibility of the evidence, absent a showing of tampering. *Medellin v. State,* 617 S.W.2d 229, 232 (Tex.Crim. App.1981); *Gallegos,* 776 S.W.2d at 315–16.

### B. Analysis

Appellant argues that the chain of custody was broken because there was no testimony from the "doctor who supposedly collected [the fingernail scrapings]" or from the person who transported the evidence from the medical examiner's office to the crime lab. Appellant further asserts that there was no evidence showing how the fingernail scrapings were stored, tagged, or labeled or showing that the scrapings were given a consistent identifying number.

Contrary to appellant's argument, testimony was offered to show that the chain of custody was maintained. Sergeant Peters testified that he bagged April's hands at

the crime scene and asked that fingernail scrapings be obtained by the Harris County Medical Examiner during the autopsy process.

The record reflects that Dr. Harminder Narula of the Harris County Medical Examiner's Office performed the autopsy; however, Dr. Narula was unavailable to testify at trial. Instead, Deputy Chief Medical Examiner Dr. Dwayne Wolf testified regarding the autopsy evidence. Dr. Wolf testified that it is common for a medical examiner to review autopsy reports prepared by colleagues and to testify about the findings. Indeed, the Court of Criminal Appeals has stated that the testimony of someone other than the doctor who performed the autopsy is sufficient for admissibility purposes. *Mays v. State,* 726 S.W.2d 937, 951 & n. 7 (Tex.Crim.App. 1986).

Dr. Wolf testified that April's body was given a unique "medical legal number" upon arrival and that the same medical legal number was used to identify materials from the autopsy. Dr. Wolf stated that the autopsy records were made at or near the time of the events recorded, were kept in the regular course of business of that office, and were made by an employee with personal knowledge of the contents. Fingernail scrapings were collected from both hands by Dr. Narula's assistant, while under Dr. Narula's direct observation and supervision. A wooden stick was used to scrape the fingernails and the samples were folded into a white piece of paper and sealed in an envelope.

Sergeant Peters testified that he transported the fingernail scrapings from the Medical Examiner's Office to the Houston Police Department ("HPD") Property Room. The scrapings were received by Hawan Wilson, in Centralized Evidence Receiving. Sergeant Peters also testified that he obtained a search warrant and

brought appellant down to the HPD Crime Lab where he watched Dr. Joseph Chu obtain a blood sample from appellant.

Christy Kim, also of the HPD Crime Lab, testified that she received the fingernail scrapings from the property room and that the scrapings were "in the paper folds," matching the description Dr. Wolf gave. Kim also testified that she received appellant's blood sample and made blood stain cards. Kim extracted the DNA and sent out two samples. One was sent to Dr. Chu for analysis; a second sample was sent to Identigene by Connie Dieringer.

Senior Forensic DNA Analyst Robin Guidry testified that Identigene received seven items of evidence from the Houston Police Department, including fingernail scrapings from April and blood sample cards from appellant and Caballero. Guidry testified that Identigene's chain of custody report states that the samples were delivered by Connie Dieringer, of the Houston Police Department, and received in person by Jennifer McCue, a DNA analyst at Identigene. The sealed evidence was given a unique identification number and placed in a secure frozen storage. Guidry testified that she retrieved the items from the freezer and performed the DNA analysis. She compared the scrapings with the blood stain cards and concluded that, while Caballero could be excluded, appellant could not be excluded as a contributor of the DNA material recovered from April's fingernails.

Although there was no direct testimony by Dr. Narula, who performed the autopsy, or Hawan Wilson, who transported the evidence within HPD, the testimony of Sergeant Peters, Dr. Wolf, and Kim established the chain of custody of the fingernail scrapings from the scene, to the Medical Examiner's Office, and then to the HPD Crime Lab. *See Mays,* 726 S.W.2d at 951 & n. 7. Further, the testimony of Kim and

Guidry established the chain of custody from the HPD Crime Lab to the Identigene lab. Any gaps were minor and went to the weight of the evidence rather than its admissibility. *Foster v. State*, 101 S.W.3d 490, 498 (Tex.App.-Houston [1st Dist.] 2002, no pet.) (holding that "particularly if the chain of custody through to the laboratory is shown," gaps go to the weight, not admissibility of evidence).

Appellant does not assert that there is evidence of tampering or that the fingernail scrapings were not collected or transported according to Houston Police Department policies and procedures. *See Lagrone v. State*, 942 S.W.2d 602, 617 (Tex.Crim.App.1997) (concluding that, without questions of tampering, most questions concerning care of a substance will go to weight and not to admissibility). Absent such evidence, the chain of custody evidence was sufficient for the State to meet its burden.

We conclude that the trial court did not abuse its discretion in admitting the DNA evidence obtained from the fingernail scrapings. The testimony elicited by the State was sufficient for the trial court to have determined that the DNA evidence was derived from the material recovered from April's fingernails and was thus what it was purported to be. Deciding what weight to give to the evidence was within the province of the jury. We hold that the trial court did not abuse its discretion in admitting the DNA testimony and evidence.

Appellant's first issue is overruled.

### "The Rule"

In his second issue, appellant contends that the trial court "erred by refusing to strike the testimony of two State witnesses who violated the rule against discussing testimony with each other" prior to testifying. The record reflects that Rule of Evidence 614 was invoked at the beginning of trial and that the trial court admonished all witnesses not to "discuss the case with anyone; not with each other or anyone else" and asked all witnesses to leave the courtroom until called.

Because of their claims that appellant confessed to killing April, Monica Parra and Maya Blakely were key witnesses and were listed on the State's witness list. During cross-examination, defense counsel asked Blakely if she had spoken with Parra outside the courtroom while both waited to be called to the stand. Blakely responded that she had. Defense counsel asked her if she and Parra had discussed any facts relating to their testimony. Specifically, appellant complains of the following testimony by Blakely:

A. . . . . I didn't tell her, you know, details. But she knew I was testifying against Gilbert.

Q. I mean, did she talk—I don't mean details, like the date he came over, and how long he stayed. But, I mean, generally, did you talk about, you know, yeah, he told me this. And, you know, he told me the same kind of things, and that's why I'm down here?

A. Yeah.

Q. You talked about—did y'all talk about—had she already testified when you talked to her, or do you know?

A. I think she was about to testify.

Q. Okay. So, y'all talked about the fact that you were going to testify that he, essentially, confessed to you?

A. Well, she was—she was asking me, did he tell you about the murder? Or this and that? And I told her, yeah. But as far as going, you know, details, I didn't tell her any details. She was asking me, you

know, are you testifying against Gilbert? And she was telling me, you know, what he had told her.

After this exchange, the jury was dismissed for the day and defense counsel moved to strike the testimony of Parra and Blakely on the ground that they violated "the Rule." The State explained to the trial court that both witnesses had arrived at the courthouse on the day after the court gave its admonishments to the witnesses and that they had not been in the courtroom to hear the admonishments. However, the prosecution stated that it had warned the witnesses not to talk to one another about their testimony.

## A. Standard of Review and Applicable Law

Rule of Evidence 614, commonly known as "the Rule," provides for the exclusion of witnesses from the courtroom during trial. TEX.R. EVID. 614. The purpose of Rule 614 is to prevent the testimony of one witness from influencing the testimony of another. *Russell v. State*, 155 S.W.3d 176, 179 (Tex.Crim.App.2005); *Phillips v. State*, 64 S.W.3d 458, 459 (Tex. App.-Houston [1st Dist.] 2001, no. pet.). Once Rule 614 is invoked, witnesses are instructed by the court that they cannot converse with one another or with any other person about the case, except by permission from the court. TEX.CODE CRIM. PROC. ANN. art. 36.06 (Vernon 1981); *Russell*, 155 S.W.3d at 179. Further, the trial court must exclude witnesses from the courtroom during the testimony of other witnesses. TEX.R. EVID. 614. However, if a witness violates this rule, the trial court still has discretion to allow testimony from the witness. *Bell v. State*, 938 S.W.2d 35, 50 (Tex.Crim.App.1996). On appeal, the trial court's decision to admit testimony will not be disturbed absent an abuse of that discretion. *Id.*

In reviewing the trial court's decision to allow testimony, we determine whether the appellant was harmed or prejudiced by the witness's violation. *Id.* Harm is established by showing that (1) the witness actually conferred with or heard testimony of other witnesses and (2) the witness's testimony contradicted the testimony of a witness from the opposing side or corroborated testimony of a witness she had conferred with or heard. *Id.*

## B. Analysis

The first prong of the test for harm has been met; Blakely admitted to talking to Parra about the case after the Rule was invoked. Under the second prong, while Parra and Blakely's testimonies corroborated each other in that they both testified that appellant confessed to killing April, their testimonies consisted of separate confessions given under different circumstances with separate facts revealed in each.

Parra testified that appellant had originally maintained that April was killed in his car during a drive-by shooting. Parra testified that, when she continued to question him as to why there were no bullet holes in his car, appellant finally stated, "I killed her." Parra testified that she asked him why and that he would not respond. This confession came in January 2001.

In November 2001, Blakely and appellant began dating. Blakely testified that she asked about April's death and that appellant initially explained that April's ex-boyfriend was very jealous and had stabbed appellant and shot April. Blakely testified that she felt he was hiding something, so she continued to question him. Finally, during a telephone conversation, Blakely threatened to end the relationship if appellant did not tell the truth. Appellant agreed but insisted that she come to his house because his telephone had been

tapped. Blakely testified that, at the house, appellant stated that he believed April was cheating on him because he found her in his car with some of his friends. Appellant told Blakely the details surrounding his taking April to Idylwood Park and then shooting her three times in the chest. Appellant then took Blakely to Idylwood Park, where he showed her the location of the incident (by a tree near a ditch) and told her specific details about April's body (such as the blood he saw in her mouth).

In *Bell*, a police investigator remained in the courtroom during the trial even though Rule 614 had been invoked. *Bell*, 938 S.W.2d at 50. However, because his testimony and opinions were "clearly . . . based upon his own experiences and investigations" and not "based upon any testimony from appellant's witnesses," and because there was no evidence to suggest the testimony he heard influenced him, the court found no abuse of discretion in allowing his testimony. *Id.* at 51.

Here, as in *Bell*, there is no evidence that Parra or Blakely's testimony was influenced by the other, and both had vastly different experiences to relate to the court. Parra and Blakely discussed different facts that Gilbert had related to them, and only one had details of the murder. There were very few details that the two had in common that would raise doubts as to the veracity of either witness's testimony. It was well within the trial court's discretion to decide whether the testimony would be allowed to stand.

We conclude that the trial court did not abuse its discretion in admitting the testimony of Blakely and Parra because, even if they violated the trial court's instructions by conversing with one another, there is no evidence that appellant was harmed or prejudiced by the violation. *Id.*

Appellant's second issue is overruled.

## Hearsay

In his third, fourth, and fifth issues, appellant contends that the trial court erred by allowing hearsay into evidence on multiple occasions over timely objections.

### A. Standard of Review and Applicable Law

We review the trial court's admission of testimony under an abuse of discretion standard. *Salazar v. State*, 38 S.W.3d 141, 153–54 (Tex.Crim.App.2001). We will uphold the trial court's decision unless it lies outside the "zone of reasonable disagreement." *Id.*

■ Hearsay is a statement, other than one made by the declarant while testifying at trial, that is offered to prove the truth of the matter asserted. TEX.R. EVID. 801(d). An extrajudicial statement or writing that is offered for the purpose of showing what was said rather than for proving the truth of the matter stated therein does not constitute hearsay. *Dinkins v. State*, 894 S.W.2d 330, 347 (Tex. Crim.App.1995); see *Ellis v. State*, 99 S.W.3d 783, 788 (Tex.App.-Houston [1st Dist.] 2003, pet. ref'd).

■ Hearsay statements are generally inadmissible. TEX.R. EVID. 802. However, there are a number of exceptions to this general proscription. See TEX.R. EVID. 803. Determining whether an out-of-court statement falls under an exception to the hearsay rule is within the trial court's discretion. *Coffin v. State*, 885 S.W.2d 140, 149 (Tex.Crim.App.1994).

### B. Analysis

■ In his third issue, appellant contends that the trial court erred in admitting Sergeant Peters's testimony concern-

ing the information he received from Crime Stoppers as hearsay.

Sergeant Peters testified that, on November 3, 2000, the day after the murder, he received a call from Crime Stoppers reporting that April had been shot by a "Gilbert Martinez." Sergeant Peters testified that appellant initially became a suspect based on that information.

 Testimony by a police officer offered to explain how the officer came. to suspect the accused, and not offered for the truth of the matter asserted, is not hearsay. *Dinkins v. State,* 894 S.W.2d at 347. The Crime Stoppers tip was offered to show how Sergeant Peters began to suspect appellant, not to prove that appellant was guilty of the crime. Sergeant Peters's testimony was not hearsay and therefore the trial court did not abuse its discretion in overruling appellant's objection.

In appellant's fourth and fifth issues, appellant contends that Albert Castillo's testimony about his conversation with April and her demeanor in his car on the evening of her murder was hearsay. Castillo testified that April told him that she wanted to leave appellant and that she sounded scared when appellant approached. Appellant argues that this testimony suggested that "appellant was violent and bad-tempered, making it more likely that he killed her."

As the State contends, these statements fall under the "state of mind" exception. Hearsay statements relating to the declarant's existing state of mind—such as mental feelings or intent—are generally admissible when that conduct is relevant to some aspect of the case. TEX.R. EVID. 803(3); *Martinez v. State,* 17 S.W.3d 677, 688 (Tex. Crim.App.2000). Castillo's testimony that April was scared was a statement of her then existing state of mind, and hence subject to the exception. There was no "statement of memory or belief to prove the fact remembered or believed," which would have made the statement inadmissible. TEX.R. EVID. 803(3).

We conclude that the complained-of statements to which Castillo testified indicated complainant's state of mind at the time they were made (i.e., her fear and intentions of leaving appellant) and were, therefore, admissible under Rule of Evidence 803(3). Accordingly, we hold that the trial court did not abuse its discretion in admitting the testimony.

Appellant's third, fourth, and fifth issues are overruled.

## Conclusion

We affirm the judgment of the trial court.