Opinion issued March 5, 2009




 






In The

Court of Appeals

For The

First District of Texas






NO. 01-07-00507-CR






ROLAND SALAZAR, Appellant


V.


THE STATE OF TEXAS, Appellee






On Appeal from the 263rd District Court

Harris County, Texas

Trial Court Cause No. 1118235






MEMORANDUM OPINION


 A jury convicted appellant Roland Salazar of capital murder. (1) Appellant had
two prior convictions--a robbery conviction in 1984 and a burglary of a motor
vehicle conviction in 1991. The trial court, having found one enhancement paragraph
in the indictment true, assessed punishment at life imprisonment. In ten issues,
appellant contends that the evidence presented at trial is legally and factually
insufficient to prove that he (1) intentionally or knowingly caused the complainant's
death by smothering her with a pillow; (2) intentionally or knowingly caused the
complainant's death by smothering her with an unknown object; (3) committed or
attempted to commit aggravated sexual assault on the complainant; (4) committed or
attempted to kidnap the complainant; and (5) committed capital murder of the
complainant. 

 We affirm the judgment of the trial court. 

Background 

 Appellant and the complainant, Norma Torres, were residents at an apartment
complex located at 17103 Imperial Valley Drive in Houston, Texas. At
approximately 6:00 a.m on July 19, 1990, the complainant accompanied her common-law husband, George Davila to a restaurant to meet her father, who supervised Davila
on a construction work site. The complainant parted company with Davila and her
father to return to her residence at the apartment complex. Appellant took his co-habitant, Annette Andrade, to work at approximately 7:00 a.m. on July 19, 1990 and
subsequently returned to his residence at the apartment complex.

 Silvia Hernandez, a resident of the complex living in an apartment immediately
below the complainant's residence, awoke at approximately 7:00 a.m. As she
watched her sister leave the apartment complex to go to work, she saw appellant
standing by the apartment swimming pool. At approximately 7:45 a.m., Hernandez
returned to her apartment and went back to bed. At approximately 8:00 a.m.,
Hernandez heard noises resembling a fight coming from the complainant's apartment. 
The noises continued for five to ten minutes. She then heard "somebody [try] to
scream and it's like something fell on the floor real hard and it's no more noise." 
Hernandez later identified appellant to police. 

 Davila left work and went to his mother's residence at 5:00 p.m., where he
waited for the complainant to pick him up. When the complainant did not come,
Davila took a taxicab to his residence at the apartment complex. When Davila arrived
at the apartment he shared with the complainant, the door was unlocked. Davila
entered the apartment and found it disheveled. Davila entered the bedroom and found
the complainant's body underneath a pile of clothes. The complainant was clothed
only in a shirt and had a pillow over her head, a shirt wrapped around her face, and
a sock stuffed in her mouth. The complainant's wrists and right ankle were bound by
ligatures made of tube socks. After attempting to revive the complainant, Davila left
the apartment and ran to the apartment complex office to contact the police.

 Houston Police Department ("HPD") crime scene investigator James Kay
walked through the complainant's apartment on July 19, 1990 and observed the
complainant while her body was still in the apartment. Kay noticed that the
complainant's patio door located to the left of the front door was ajar when he entered
the complainant's apartment. Kay saw that the complainant's bathroom had three
towels on the floor, which he assumed were wet because the complainant had taken
a shower just prior to her death. Kay observed several hair products and a blow dryer
in the bathroom that Kay assumed the complainant used to prepare herself to go out
for the day. He noticed a flesh wound on the complainant's hip, and saw that the
complainant had a foaming mouth indicative of pulmonary edema, a sign of
suffocation trauma. In addition to those injuries, the complainant's eyes had signs of 
hemorrhaging indicative of suffocation trauma. The complainant's mouth had
abrasions and contusions indicative of death by asphyxia, possibly caused by the
pillow found over the complainant's face.

 The complainant's body was autopsied by the Harris County Medical
Examiner's Office. The autopsy report indicated that the complainant died from
causes related to asphyxiation. The report also indicated that there was semen present
in the complainant's vagina and rectum. Kay found a semen-stained fitted bed sheet,
a semen-stained blue striped towel, and a semen-stained peach colored rag in the
complainant's apartment. Kay also found a bedspread and a pastel shirt in the
complainant's apartment that were soiled with blood stains and other DNA material. 

 Police questioned appellant after Sylvia Hernandez identified him to HPD
homicide investigator Sergeant C.T. Mosqueda. Police also obtained blood and
saliva samples from appellant and Davila. The police shipped all semen evidence,
blood stains and blood samples and other DNA materials to the genetics laboratory
at Baylor College of Medicine in Houston, Texas. The initial tests done in 1990,
using the materials found by police in the complainant's apartment and obtained from
the complainant's body, appellant, and Davila produced inconclusive results. Due to
the inconclusive results, the case was closed.

 Kay stored all the materials he took from the complainant's apartment and the
"stick portions" of the swabs taken from the complainant's body in the property room
of the Houston Police Department and personally tagged the evidence. Grace Das,
an HPD officer working as a crime lab technician in 1990, took blood and saliva
samples obtained from appellant and Davila and soft portions of the swabs taken from
the complainant's vaginal and rectal areas and transferred them to a criminologist
working for the HPD crime lab.

 In 2004, Sergeant Eric Mehl of the HPD homicide "cold case" squad reopened
the case. Mehl retrieved the materials stored by Kay in the HPD property room. 
Mehl also retrieved the portions of the swabs taken from the complainant's body 
stored in the crime lab. Using the stored samples from appellant, Davila, and the
complainant, Mehl submitted the samples to Orchid Cellmark laboratory in Dallas,
Texas. Using newer technology and the never tested "stick portions" of the swabs
taken from the complainant's body, the laboratory isolated DNA on a swab taken
from the complainant's body consistent with appellant's DNA. Mehl sought and
obtained an arrest warrant for appellant based on the new results. Appellant was
arrested on June 29, 2005 at a city park across the street from Houston City Hall. 
Mehl obtained a new buccal sample from appellant and submitted the sample for
additional testing at the Orchid CellMark laboratory. The test results again indicated
the presence of appellant's DNA when compared with a swab taken from the
complainant's rectal area. 

 Appellant was indicted for capital murder for intentionally and knowingly
causing the death of the complainant in the course of committing aggravated sexual
assault and kidnaping. Appellant testified at trial that he was not involved in the
complainant's death. He testified that he did not know the complainant, but he had
seen her at the apartment complex, and he thought the complainant "was very
beautiful." He testified that he knew that the complainant lived in an apartment near
the pool in the complex. He also testified that he was at lunch with his mother at the
time of the complainant's death. He disputed the State's assertions and police
testimony that he lived with Annette Andrade at the apartment complex at the time
of the complainant's death and stated that he lived alone at the complex. When asked
on cross-examination to explain the presence of his semen on the complainant's body,
appellant explained that the Texas Department of Corrections took his semen from
a tissue he kept in a plastic bag to give to his parents. HPD Sergeant John W. Belk
testified that he interviewed appellant after his arrest on June 29, 2005 and said that
appellant told him that "[appellant] would lie if it were to protect a family member or
to protect himself." 

Legal and Factual Sufficiency 

Standard of Review


 To review the legal sufficiency of the evidence, we must view the evidence in
the light most favorable to the verdict and then determine whether a rational juror
could have found the essential elements of the offense beyond a reasonable doubt. 
Jackson v. Virginia, 443 U.S. 307, 320-21, 99 S. Ct. 2781, 2790 (1979). In
conducting this review, we do not reevaluate the weight and credibility of the
evidence, but act only to ensure that the jury reached a rational decision. Muniz v.
State, 851 S.W.2d 238, 246 (Tex. Crim. App. 1993). Evidence that is legally
sufficient to support a conviction may not be factually sufficient to support a
conviction. Rollerson v. State, 227 S.W.3d 718, 724 (Tex. Crim. App. 2007). 

 "Evidence is factually insufficient to support the verdict if it is clearly wrong
or manifestly unjust or against the great weight and preponderance of the evidence."
Rollerson, 227 S.W.3d at 724. A factual sufficiency review involves three ground
rules. Lancon v. State, 253 S.W.3d 699, 704 (Tex. Crim. App. 2008). First, we must
recognize that a jury has already passed on the facts and we must accord the jury the
proper deference to avoid substituting our judgment for that of the jury. Id. at 704-05
(citing Clewis v. State, 922 S.W.2d 126 (Tex. Crim. App. 1996)). Second, when we
find the facts determined by the jury to be insufficient to affirm a conviction, we must
clearly lay out and explain how the evidence supporting the verdict is too weak on its
own, or how contradicting evidence greatly outweighs evidence supporting the
verdict. Id. at 705. Finally, we view all of the evidence in a neutral light when
conducting this review. Id. We may set aside a verdict only when the evidence
supporting the verdict is so weak as to render the verdict clearly wrong or manifestly
unjust. Id. (citing Cain v. State, 958 S.W.2d 404, 406 (Tex. Crim. App. 1997)). 

 Aggravated Sexual Assault


 In his fifth and sixth points of error, appellant argues that the evidence is
legally and factually insufficient to prove appellant committed or attempted to
commit aggravated sexual assault against the complainant. A person commits
aggravated sexual assault when he intentionally or knowingly causes penetration of
the anus or sexual organ of someone else without the person's consent and causes the
death of that person in the course of the same criminal episode. See Tex. Penal
Code Ann. § 22.021(a)(1)(A)(i) (Vernon Supp. 2008); see also id. 

§ 22.021(a)(2)(A)(i) (Vernon Supp. 2008). A sexual assault occurs without consent
when some force is used by the actor to coerce the person into the sexual act. Edoh
v. State, 245 S.W.3d 606, 611 (Tex. App.--Houston [1st Dist.] 2007, no pet.). 

 Here, HPD crime scene investigator James Kay found the complainant's body
at the scene. The body was clothed only in a shirt. The complainant's head was
covered by a pillow, and her face was wrapped in a sheet. Kay testified that the
complainant's wrists and ankles were bound by ligatures made of tube socks and
other articles of clothing. Kay also testified that he noted abrasions on the
complainant's body. He also testified that, when he discovered the complainant's
body at the crime scene, he noticed a pillow with a pink pillowcase near the
complainant's head. Kay testified that there were towels strewn throughout the crime
scene. He also testified, based on evidence found in the apartment, that the
complainant was probably attacked after she took a shower and was preparing to go
out for the day. 

 Matthew Quartero, a forensic scientist with expertise in DNA analysis, testified
on the basis of his analysis of DNA material found on swabs taken from the
complainant's vaginal and rectal areas, that the DNA found was consistent with
appellant's DNA. Hernandez heard noises from a fight that lasted five to ten minutes,
which indicates the sexual conduct was not consensual. Dr. Stephen Wilson, a Harris
County assistant medical examiner, reviewed the autopsy records completed in 1990
and testified that the complainant's mouth had abrasions and contusions consistent
with suffocation trauma and that the complainant's eyes had signs of hemorrhaging
consistent with suffocation trauma. 

 Viewing the evidence in a light most favorable to the verdict, we hold that a
rational jury could find, beyond a reasonable doubt, that appellant committed
aggravated sexual assault of the complainant. See Jackson, 443 U.S. at 320-21, 99
S. Ct. at 2790; Edoh, 245 S.W.3d at 611. Therefore, the evidence presented at trial
that appellant committed aggravated sexual assault of the complainant is legally
sufficient to support the conviction. 

 Appellant testified at trial that he did not kill the complainant, because he was
at lunch with his mother at the time. He also explained that the Texas Department of
Corrections took his semen from a tissue he kept in a plastic bag and the police
subsequently used the semen to implicate him in the complainant's sexual assault.
Giving due deference to the jury's findings of fact, we hold that the evidence that
appellant committed aggravated sexual assault is not such that the verdict is clearly
wrong or manifestly unjust or against the great weight and preponderance of the
evidence. See Lancon, 253 S.W.3d at 704. Therefore, the evidence presented at trial
that appellant committed aggravated sexual assault of the complainant is factually
sufficient to support the conviction. 

 We overrule appellant's fifth and sixth points of error. (2)

 Kidnaping


 In his seventh and eighth points of error, appellant argues that the evidence is
legally and factually insufficient to prove that he committed or attempted to commit
the offense of kidnaping the complainant. 

 A defendant commits kidnaping when he intentionally or knowingly restricts
another person's movements without consent by confining the person through use of
force, intimidation, or coercion. See Tex. Penal Code Ann. § 20.03(a) (Vernon
2003); see also Swearington v. State, 101 S.W.3d 89, 95 (Tex. Crim. App. 2003). 
The offense is complete when the defendant successfully restrains the other person
and there is evidence to show that the defendant intended to restrain the other person
by "either secretion or the use or threat to use deadly force." Swearington, 101
S.W.3d at 95.

 The State presented testimony from HPD crime scene investigator James Kay,
who observed the complainant's body at the crime scene. Kay testified that the
complainant's wrists and right ankle were tightly bound by ligatures made of tube
socks and other articles of clothing. The State also presented testimony from forensic
scientist and DNA expert Matthew Quartaro, who testified that he discovered skin
cells on the socks used to bind the complainant. Quartero testified he could not
exclude appellant as a contributor after analyzing the skin cells found on the socks. 

 Viewing the evidence in a light most favorable to the verdict, a rational juror
could find, beyond a reasonable doubt, that appellant committed the offense of
kidnaping. See Jackson, 443 U.S. at 320-21, 99 S. Ct. at 2790; Swearington, 101
S.W.3d at 95. Therefore, the evidence of kidnaping presented at trial is legally
sufficient.

 Appellant denied that he ever bound anyone in the manner the complainant was
bound in his "whole life." Giving due deference to the jury's findings of fact, we
hold that the conclusion that appellant kidnaped the complainant is not clearly wrong
or manifestly unjust or against the great weight and preponderance of the evidence. 
See Lancon, 253 S.W.3d at 704. 

 We overrule appellant's seventh and eighth points of error.

Death by Asphyxiation

 In his first, second, third and fourth points of error, appellant argues that the
evidence is legally and factually insufficient to prove appellant caused the death of
the complainant by smothering the complainant with a pillow or an unknown object. 
A physician's testimony that the complainant died from asphyxia is legally sufficient
to prove that the complainant's death was caused by a method of asphyxiation. 
Morales v. State, 792 S.W.2d 789, 791 (Tex. App.--Houston [1st Dist.] 1990, no
pet.). 

 HPD crime scene investigator James Kay surveyed the crime scene at the time
of the offense in 1990 and testified at trial that when he entered the apartment to
investigate the crime scene, he found the patio door ajar. Kay also testified that a
pillow was found near the face of the complainant and that the complainant had signs
of pulmonary edema, a condition consistent with death through asphyxia. George
Davila, the complainant's common-law husband, testified that when he discovered
the complainant's body, the complainant had a shirt wrapped around her head, a sock
stuffed in her mouth and a pillow over her head. Dr. Stephen Wilson, Harris County
assistant medical examiner, testified that the complainant's mouth had abrasions and
contusions consistent with suffocation trauma and the complainant's eyes had signs
of hemorrhaging consistent with suffocation trauma. He testified that the
complainant's injuries could have been the result of asphyxiation by a pillow. Sylvia
Hernandez, the complainant's downstairs neighbor, testified that she saw appellant
by the pool of the apartment complex at 7:00 a.m. on the date the complainant died. 
Hernandez also testified that, at approximately 8:00 a.m., she heard noises resembling
a struggle coming from the complainant's apartment. Skin cells consistent with
appellant's DNA were found on the socks used to bind the complainant. 

 Viewing the evidence in a light most favorable to the verdict, a rational juror
could find, beyond a reasonable doubt, that appellant caused the death of the
complainant by a method of asphyxiation. See Jackson, 443 U.S. at 320-21, 99 S. Ct.
at 2790; Morales, 792 S.W.2d at 791. Therefore, the evidence presented at trial is
legally sufficient to support the conclusion that appellant caused the death of the
complainant by smothering the complainant with a pillow or an unknown object. Appellant testified that he did not cause the death of the complainant in any
manner. Giving due deference to the jury's findings of fact, we hold that the
conclusion that appellant caused the complainant's death by smothering her with a
pillow or an unknown object is not clearly wrong or manifestly unjust or against the
great weight and preponderance of the evidence. See Lancon, 253 S.W.3d at 704. 
Therefore, the evidence presented at trial is factually sufficient to support the
conclusion that appellant caused the death of the complainant by smothering her with
a pillow or an unknown object. 

 We overrule appellant's first, second, third and fourth points of error.

Capital Murder

 In his ninth and tenth points of error, appellant argues that the evidence is
legally and factually insufficient to support his conviction for capital murder. A
person commits capital murder when he intentionally commits a murder in the course
of committing aggravated sexual assault. Tex. Penal Code Ann. § 19.03(a)(2)
(Vernon Supp. 2008). We have already held that the State presented legally and
factually sufficient evidence to prove that appellant committed aggravated sexual
assault against the complainant. We have also held that the State presented legally
and factually sufficient evidence to prove that appellant caused the complainant's
death by a method of asphyxiation through the use of a pillow or an unknown object. 
As these offenses occurred concurrently, the evidence is legally and factually
sufficient to support appellant's conviction for capital murder. See Jackson, 443 U.S.
at 320-21, 99 S. Ct. at 2790; Lancon, 253 S.W.3d at 704. 

 We overrule appellant's ninth and tenth points of error. 













Conclusion


 We affirm the judgment of the trial court. 







 Evelyn Keyes

 Justice


Panel consists of Justices Taft, Keyes, and Alcala.

Do not publish. Tex. R. App. P. 47.4.
1. See Tex. Penal Code Ann. § 19.03(a)(2) (Vernon Supp. 2008). 
2. Appellant also argues that the evidence stored by police in 1990 and used at trial in
2007 was legally insufficient to support his conviction because the State failed to
establish the chain of custody of the evidence from the time it was initially stored. 
Proof of chain of custody goes to the weight of the evidence presented at trial. 
Lagone v. State, 942 S.W.2d 602, 617 (Tex. Crim. App. 1997). A jury trumps either
a trial or an appellate court on weight of evidence determinations. Evans v. State, 202
S.W.3d 158, 164 (Tex. Crim. App. 2006). Chain of custody is sufficiently
authenticated when the State has shown the beginning and the end of the chain,
particularly when the chain ends at a laboratory. Martinez v. State, 186 S.W.3d 59,
62 (Tex. App.--Houston [1st Dist.] 2005, pet. ref'd). Kay testified that he gathered
evidence from the complainant's apartment that bore semen stains and other DNA
materials and submitted the evidence for genetic testing. Kay also testified that, after
the testing was completed, he took the evidence to the HPD property room and tagged
the evidence itself. Grace Das, a HPD officer who worked as a crime lab technician
in 1990, testified that she turned over appellant's blood and saliva samples and
portions of swabs taken from the complainant's body to a criminologist working in
the HPD crime lab. HPD Sergeant Eric Mehl retrieved the materials stored by Kay
in the HPD property room. Mehl also retrieved the portions of the swabs taken from
the complainant's body stored in the crime lab. The jury weighed the evidence
regarding the chain of custody and apparently determined that proof of chain of
custody was satisfied. We cannot trump the jury's analysis. Evans, 202 S.W.3d at
164.