# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-25-00004-CR

YATANYA YACHELL CALHOUN, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 8th District Court
Hopkins County, Texas
Trial Court No. 2430480

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice Rambin

## MEMORANDUM OPINION

A Hopkins County jury convicted Yatanya Yachell Calhoun of delivery of one gram or more but less than four grams of a controlled substance from penalty group 1, a second-degree felony, and assessed a sentence of fifteen years' imprisonment. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.112(c) (Supp.). Calhoun brings three issues on appeal: (1) the trial court erred in admitting the controlled substance and its packaging over her objection, (2) her trial counsel provided ineffective assistance of counsel in failing to object to the admission of prior bad acts in the form of prior judgments against her through the prosecutor rather than a witness, and (3) the trial court erred by commenting on the weight of the evidence in response to a note from the jury. Finding no reversible error, we affirm the judgment of the trial court.

## I.    Background

Tanner Steward, a narcotics investigator with the Hopkins County Sheriff's Office (HCSO), worked with a confidential informant (CI) to make a purchase of crack cocaine from Calhoun. After the CI completed the purchase, the HCSO obtained the bag the CI received from Calhoun and sent it to the Texas Department of Public Safety (DPS) Crime Laboratory in Tyler, where James Anthony Marzelli, a forensic chemist, determined the purchased substance was cocaine.

At trial, Calhoun objected that the State had provided "[n]o proper predicate" for the admission of the narcotics and its packaging. The trial court admitted the evidence over Calhoun's objection, and the jury found Calhoun guilty. During the punishment phase of the trial, the State offered evidence of Calhoun's prior offenses by verbally summarizing the contents of

2

records from several exhibits for the jury and then admitting the exhibits into evidence, with no objection from Calhoun. During its deliberations, the jury sent a note to the trial court, referencing two of the exhibits related to an engaging-in-organized-criminal-activity offense and asking whether organized crime is a felony. The trial court answered by sending three exhibits to the jury and stating, "The case was filed as a felony but resolved as a misdemeanor." Again, Calhoun did not object.

The jury assessed Calhoun's punishment at fifteen years' incarceration. Calhoun appeals.

## II.     The Trial Court Did Not Err in Admitting the Crack Cocaine and Its Packaging

Calhoun's first issue concerns chain of custody. Calhoun urges that the crack cocaine and its packaging "were not properly authenticated in that the State failed to prove the chain of custody." Calhoun urges that the trial court erred by admitting this evidence over her objection of "[n]o proper predicate."

### A.     Standard of Review

We review a trial court's "decision 'to admit or exclude evidence'" for an abuse of discretion. *Irsan v. State*, 708 S.W.3d 584, 611 (Tex. Crim. App. 2025) (quoting *Beham v. State*, 559 S.W.3d 474, 478 (Tex. Crim. App. 2018)). "As long as the trial judge's ruling was within the 'zone of reasonable disagreement,' it will not be disturbed on appeal." *Id.* (quoting *Beham*, 559 S.W.3d at 478). This "zone of reasonable disagreement" standard has been used specifically for a trial court's rulings regarding authenticity. *Fowler v. State*, 544 S.W.3d 844, 848–49 (Tex. Crim. App. 2018).

3

## B. Authenticity and Chain of Custody

"To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." TEX. R. EVID. 901(a).

Authentication is a "preliminary determination" by the trial court. *Fowler*, 544 S.W.3d, at 849 (quoting *Butler v. State*, 459 S.W.3d 595, 600 (Tex. Crim. App. 2015)). "[I]t is the jury's role ultimately to determine whether an item of evidence is indeed what its proponent claims; the trial court need only make the preliminary determination that the proponent of the item has supplied facts sufficient to support a reasonable jury determination that the proffered evidence is authentic." *Id.* at 848–49 (quoting *Butler*, 459 S.W.3d at 600).

The authentication standard "has been aptly described as a 'liberal standard of admissibility.'" *Butler v. State*, 459 S.W.3d 595, 600 (Tex. Crim. App. 2015) (quoting CATHY COCHRAN, TEXAS RULES OF EVIDENCE HANDBOOK 922 (7th ed. 2007–08)). Authenticity may be established "by testimony from a witness with knowledge that an item is what it is claimed to be." *Martinez v. State*, 186 S.W.3d 59, 62 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd) (citing TEX. R. EVID. 901(b)(1)). "The authentication requirement for admissibility is met once the State has shown the beginning and the end of the chain of custody, particularly when the chain ends at a laboratory." *Cain v. State*, 501 S.W.3d 172, 175 (Tex. App.—Texarkana 2016, no pet.) (quoting *Martinez*, 186 S.W.3d at 62).[1] "Absent evidence of tampering or other fraud,

---

[1]Our Court has previously determined that the "chain[] of custody commence[s] with the officer taking possession of the drug either from the defendant or from the cooperating buyer." *Alexander v. State*, No. 06-06-00169-CR, 2007 WL 2262895, at *9 (Tex. App.—Texarkana Aug. 9, 2007, pet. ref'd) (mem. op., not designated for publication) (citing *Young v. State*, 183 S.W.3d 699 (Tex. App.—Tyler 2005, pet. ref'd); *Foster v. State*, 101 S.W.3d

4

. . . problems in the chain of custody do not affect the admissibility of the evidence." *Druery v. State*, 225 S.W.3d 491, 503 (Tex. Crim. App. 2007). "Instead, such problems affect the weight that the fact-finder should give the evidence, which may be brought out and argued by the parties." *Id.* at 503–04. "[A]ny gaps in between [beginning and end] go to weight rather than admissibility, particularly where the chain goes inside the laboratory." *Kelly v. State*, 529 S.W.3d 504, 513 (Tex. App.—Texarkana 2017, no pet.) (quoting *Gallegos v. State*, 776 S.W.2d 312, 315–16 (Tex. App.—Houston [1st Dist.] 1989, no pet.)).

C.     Analysis

The trial court's decision was, at a minimum, in the zone of reasonable disagreement. Calhoun asserts that the State failed to establish the chain of custody of the narcotics for two reasons. Calhoun argues the CI was inadequately searched and was highly motivated to produce fraudulent evidence to support the buy. Calhoun also argues that the State did not trace the chain of custody from beginning to end. Though Calhoun contends the pre-buy search of the CI was inadequate, there was a search. Steward was asked, "What steps did you take to make sure that Ms. Mayfield didn't have any drugs or money beforehand?" Steward answered, "The CI Mayfield was searched and so was the vehicle." Though Calhoun contends that the State did not

---

490 (Tex. App.—Houston [1st Dist.] 2002, no pet.)). That approach appears to have continuing viability. *See Dunning v. State*, 572 S.W.3d 685, 694 (Tex. Crim. App. 2019) ("Appellant complains that Budowle improperly suggested that the shorts were contaminated with trace DNA *after the police seized* them (i.e., that the chain of custody had been compromised) . . . ." (emphasis added) (footnote omitted)). However, when there is evidence of a pre-buy search of the informant, we have included that pre-buy search in the authenticity analysis. *Cain*, 501 S.W.3d at 175 ("As the officer in *Watson* had done, the officer here searched the person and vehicle of the confidential informant before sending him to Cain's home to buy drugs." (citing *Watson v. State*, 421 S.W.3d 186, 191–92 (Tex. App.—San Antonio 2013, pet. ref'd))).

trace the chain-of-custody from beginning to end, there was testimony to that effect, as discussed below.

Investigator Steward testified that he searched the CI and provided her with money for the purchase and a recording device. Steward stated he also called the CI on her cell phone so that they would have an open line of communication during the buy. Steward said the CI traveled to the convenience store where the buy was to take place, but Calhoun and the CI left the convenience store and went to a nearby residence, where he lost sight of them when they entered a detached garage at the residence. Shortly thereafter, the CI left the garage and informed Steward that the buy was complete, and the CI had the narcotics.

Investigator Richard Brantly, also with the HCSO, then met with the CI at the convenience store to take possession of the narcotics. Brantly testified that he recovered from the CI a substance in a plastic Walmart bag with a knot tied in it. Brantly testified that he placed the bag in his vehicle and secured his vehicle while he searched the CI's vehicle. Brantly then went to the residence where the buy took place, where he again secured his vehicle, and, when he left, he and Steward went back to the HCSO, where Steward removed the bag from Brantly's vehicle.

Investigator Brantly testified that the protocol at the HCSO is to take any evidence from a case and put it into a locked temporary storage locker. The officer placing the evidence in the locker puts the evidence in a secure evidence bag with a label including the weight. The officer then places the key to the locker inside the locker, and at that point, only Brantly can open it from inside the evidence room. Brantly then removes the sealed evidence from the locker and

6

places it in a labeled manila envelope, completes the chain-of-custody log, and places the evidence in a drug vault. Sometime later, Brantly completes a laboratory submission sheet, removes the evidence from the drug vault, and transports it to Tyler for analysis at the DPS Crime Laboratory. After the evidence is analyzed by the lab, Brantly receives it back, records it in the chain-of-custody log, and places it back in the drug vault for later use as evidence in court.

Investigator Brantly testified that State's exhibits 9 and 9A, ultimately admitted by the trial court, were the substance that he recovered from the CI, along with its packaging; transported to the crime laboratory for testing; received back into his possession from the crime laboratory; and brought to court. Specifically, Brantly identified exhibit 9A as a evidence bag containing a gray-colored baggie, which contained the controlled substance. Brantly stated that exhibit 9A "is what the . . . investigator turn[ed] in to the temporary property locker." Brantly identified exhibit 9 as a manila envelope that he packaged the narcotics in, taped up, initialed, and dated prior to giving it to the DPS lab. Brantly identified a mark that he put on the exhibits for tracking purposes in the HCSO computer system, along with a number on a blue tag that was assigned by the crime lab and a piece of red tape the crime laboratory used to seal the manila envelope after it completed its analysis. Brantly testified that exhibits 9 and 9A contained the same identifying number.

Marzelli testified that he received the sealed and properly labeled evidence from HCSO. Marzelli testified that the first thing he did was to make sure the evidence was properly sealed and the chain of custody was intact. He then checked that the evidence matched the submission form, and he began his analysis of the substance. After testing, Marzelli resealed the evidence

and noted his findings in a formal lab report. That report contains his findings from his analysis of the evidence along with the crime lab's unique lab number assigned to the evidence. Marzelli testified that the testing indicated that the substance Calhoun sold to the CI was 1.64 grams of cocaine.

The CI testified that she did not bring her own crack cocaine to the buy. She stated she would "[d]efinitely not" do that because "[t]hat would be ignorant." The CI testified that, after the buy was complete, she met Investigator Brantly at the convenience store, and he took the narcotics at that point.

Calhoun argues the State failed to establish a chain of custody of the narcotics because Investigator Steward did not testify about taking the narcotics from Investigator Brantly, packaging and labeling them, and placing them in the lockbox, and Brantly testified only as to the usual procedure at the HCSO and not what happened with these particular narcotics. But Brantley testified that Steward removed the narcotics from Brantley's car and turned the baggie containing the narcotics into the temporary property locker, and Marzelli testified that he received the properly labeled and sealed evidence from the HCSO.

We disagree with Calhoun that the State's evidence did not establish the chain of custody. The State established the admissibility of the narcotics by offering evidence as to when law enforcement took possession of the contraband and of the identification of the contraband as cocaine at the DPS crime lab. That testimony goes to "the beginning and the end of the chain of custody, particularly when the chain ends at a laboratory." *Cain*, 501 S.W.3d at 175 (quoting *Martinez*, 186 S.W.3d at 62).

8

Calhoun's additional argument as to the chain of custody centers on the CI. Calhoun urges that the CI was motivated to complete a buy and that the CI was inadequately searched. But these types of arguments "do not affect the admissibility of the evidence," as they are not evidence of tampering or other fraud. *Druery*, 225 S.W.3d at 503. Rather, these types of arguments "affect the weight that the fact-finder should give the evidence, which may be brought out and argued by the parties."[2] *Id.* at 503–04.

Because the State established the admissibility of the narcotics by providing evidence establishing the beginning and the end of the chain of custody, and there was no evidence of tampering or other fraud, the trial court did not abuse its discretion in admitting those exhibits into evidence.

We overrule Calhoun's first issue.

## III. Calhoun Did Not Establish that Her Trial Counsel Was Ineffective

In her second issue, Calhoun asserts her trial "counsel was ineffective in allowing the admission of bad acts without requiring the State to connect prior judgments to Calhoun, instead allowing the prosecutor to do so in the stead of a witness."

### A. Standard of Review and Applicable Law

We review the adequacy of representation using *Strickland*'s two-step test. *Tanner v. State*, 707 S.W.3d 371, 376 (Tex. Crim. App. 2024) (citing *Strickland v. Washington*, 466 U.S. 668 (1984)); *see Auld v. State*, 652 S.W.3d 95, 112 (Tex. App.—Texarkana 2022, no pet.). "In order to reverse a conviction for ineffective assistance of counsel, we must find that [a]

---

[2]Calhoun raised these arguments at trial, and the jury rejected them.

9

defendant has shown: (1) counsel's performance was deficient and (2) the defendant suffered prejudice." *Tanner*, 707 S.W.3d at 376 (citing *Strickland*, 466 U.S. at 694).

To establish counsel's deficiency, a defendant claiming ineffective assistance of counsel "must prove that his counsel's actions fell 'below the professional norm of reasonableness.'" *Id.* (quoting *McFarland v. State*, 928 S.W.2d 482, 500 (Tex. Crim. App. 1996) (per curiam), *overruled on other grounds by Mosley v. State*, 983 S.W.2d 249, 263 n.18 (Tex. Crim. App. 1998)). We consider "the totality of the representation and the particular circumstances of each case in evaluating effectiveness of counsel." *Id.* "There is a strong presumption that trial counsel's conduct fell within the wide range of reasonable professional assistance." *Id.* (citing *Strickland*, 466 U.S. at 689).

The second *Strickland* prong, sometimes referred to as "the prejudice prong," "may be measured in one of two ways: a reasonable probability of a different outcome or a reasonable probability of a different decision by the defendant." *Swinney v. State*, 663 S.W.3d 87, 90 (Tex. Crim. App. 2022). The manner in which prejudice must be shown "depends on the possible result of the deficient performance." *Id.* Here, Calhoun complains that the ineffective assistance of her trial counsel affected the punishment she received. In this instance, then, with the alleged "deficient performance pertain[ing] to punishment," a showing of prejudice "depend[s] on a reasonable probability that the sentencer would have assessed a more lenient punishment absent the errors." *Id.*

"An appellant bears the burden of proving ineffectiveness by a preponderance of the evidence." *Tanner*, 707 S.W.3d at 376. "Failure to make the required showing on either prong

of the *Strickland* analysis defeats the ineffectiveness claim." *Id.* at 376–77. "This is why ineffective-assistance claims are 'generally not successful on direct appeal and are more appropriately urged in a hearing on an application for a writ of habeas corpus.'" *Id.* at 377 (quoting *Lopez v. State*, 343 S.W.3d 137, 143 (Tex. Crim. App. 2011)). "Although the record [may] also be developed through a motion for new trial," on direct appeal, the record is "'usually inadequately developed and "cannot adequately reflect the failings of trial counsel" for an appellate court "to fairly evaluate the merits of such a serious allegation."'" *Id.* (quoting *Lopez*, 343 S.W.3d at 143).

### B.     Analysis

Calhoun argues her trial counsel provided ineffective assistance when he did not object to the admission of her criminal history through the prosecutor's reading of "various court judgments, charging instruments[,] and plea admonishments related to Calhoun's criminal history" into the trial record before the jury during the punishment phase of trial. Calhoun further argues that without the prosecutor's testimony regarding those criminal records, the State would not have successfully linked the prior convictions to her, thus the jury would have assessed a lesser punishment.

In support of her argument, Calhoun cites only one case for the proposition that "[a] prosecutor who tries a case should not testify in it." *See Ramon v. State*, 159 S.W.3d 927, 931 (Tex. Crim. App. 2004). While this may be true as a general proposition, *Ramon* is distinguishable from this case. In *Ramon*, a prosecutor testified during the guilt/innocence phase "in order to correct a 'false impression'" regarding alleged prejudice in prosecuting Ramon

11

caused by a message the prosecutor left at the office of the State's DNA expert. *Id.* at 929. The *Ramon* court concluded that the prosecutor's "behavior was improper," noting that "[t]he prosecutor who tries a case should not testify as a witness in regard to *a contested matter* absent a showing that his testimony is necessary." *Id.* at 931 (emphasis added) (quoting *Brown v. State*, 921 S.W.2d 227, 231 (Tex. Crim. App. 1996) (Keller, J., concurring)).

Conversely, here, Calhoun's criminal history was not contested, and the prosecutor here offered the evidence of Calhoun's criminal history during the punishment phase. Admission of criminal history during the punishment phase is authorized by Article 37.07 of the Texas Code of Criminal Procedure. TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3(a)(1) (Supp.). Further, had Calhoun's trial counsel objected to the admission of her criminal history through the prosecutor, it is highly likely the criminal history could have been admitted as documentary evidence without testimony or through a different witness. *See Flowers v. State*, 220 S.W.3d 919, 921–22 (Tex. Crim. App. 2007) ("Just as there is more than one way to skin a cat, there is more than one way to prove a prior conviction."). Finally, the record is silent as to Calhoun's trial counsel's motives in allowing admission of the criminal history through the prosecutor—perhaps trial counsel was aware the evidence would come in otherwise, or perhaps trial counsel felt a parade of additional witnesses to establish Calhoun's criminal history was not advantageous to Calhoun's trial strategy. *See Tanner*, 707 S.W.3d at 377.

On this record, we cannot conclude that Calhoun has overcome the "strong presumption that [her] trial counsel's conduct fell within the wide range of reasonable professional assistance"

12

necessary to establish the first *Strickland* prong, a showing of deficient performance.[3] *See id.* at 376.

We overrule Calhoun's second issue.

**IV.  Even Assuming the Trial Court's Response to the Jury's Note Was in Some Way an Improper Comment on the Weight of the Evidence, There Was no Egregious Harm**

In her third issue, Calhoun argues the trial court erred "in responding to a jury note by commenting on the weight of the evidence."

**A.  Standard of Review and Applicable Law**

"The jury is bound to be governed by the law it receives from the court." *Lucio v. State*, 353 S.W.3d 873, 875 (Tex. Crim. App. 2011) (citing TEX. CODE CRIM. PROC. ANN. art. 36.13). "Although the trial court ordinarily provides instructions to the jury in their entirety before the jury retires to deliberate, the court may give further written instructions upon the jury's written request for additional guidance regarding applicable law." *Id.* (citing TEX. CODE CRIM. PROC. ANN. art. 36.16).  "When the trial court responds substantively to a question the jury asks during deliberations, that communication essentially amounts to a supplemental jury instruction, and the trial court must follow the same rules for impartiality and neutrality that generally govern jury instructions." *Id.*  The court in *Lucio* further stated,

---

[3]Because Calhoun has not met her burden of establishing the first *Strickland* prong, we need not address the second. *See Tanner*, 707 S.W.3d at 376–77.

13

> Because a trial court's answer to a jury's question must comply with the same rules that govern charges, the trial court, as a general rule, must limit its answer to setting forth the law applicable to the case; it must not express any opinion as to the weight of the evidence, sum up the testimony, discuss the facts, or use any response calculated to arouse the sympathy or excite the passions of the jury.

*Id.* (citing TEX. CODE CRIM. PROC. ANN. art. 36.14).

Generally, a trial court's answer to a question from the jury during deliberations amounts to a supplemental jury instruction, thus we review alleged error in the trial court's answer as we review jury-charge error. *See id.*; *Daniell v. State*, 848 S.W.2d 145, 147 (Tex. Crim. App. 1993); *Wilson v. State*, 391 S.W.3d 131, 138 (Tex. App.—Texarkana 2012, no pet.). We review a claim of error in a jury charge in two steps. *Alcoser v. State*, 663 S.W.3d 160, 165 (Tex. Crim. App. 2022). "First, we determine whether the charge is erroneous. If it is, then we must decide whether the appellant was harmed by the erroneous charge." *Id.* (citing *Wooten v. State*, 400 S.W.3d 601, 606 (Tex. Crim App. 2013)). "If a defendant timely objects to alleged jury-charge error, the record need only show 'some harm' to obtain relief." *Id.* (citing *Almanza v. State*, 686 S.W.3d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g)). If a defendant does not timely object, "the record must show 'egregious harm'" to obtain relief. *Id.* (citing *Almanza*, 686 S.W.3d at 171).

We assess harm by reviewing "the entire jury charge, the state of the evidence, including the contested issues and weight of [the] probative evidence, the argument of counsel[,] and any other relevant information revealed by the record of the trial as a whole." *Id.* (first alteration in original) (quoting *Almanza*, 686 S.W.3d at 171). "An erroneous jury charge is egregiously

14

harmful if it affects the very basis of the case, deprives the accused of a valuable right, or vitally affects a defensive theory." *Id.* (citing *Almanza*, 686 S.W.3d at 171).

**B.     Analysis**

During its deliberations, the jury sent a question to the trial court that read, "Theft exhibit #17.  Is organized crime [a] felony #18."  The trial court responded, in writing, to the question as follows:  "I am sending you State's Exhibits #s 17, 18, and 19.  The case was filed as a felony but resolved as a misdemeanor."  Calhoun did not object to the trial court's communication, thus, if the trial court's supplemental instruction was erroneous, she must show egregious harm to obtain relief.  *See id.*

The parties' trial strategies must be considered to put the jury's question into context. First, one of Calhoun's prior offenses that the State read to the jury in the punishment phase was an indictment for organized crime that was reduced to a charge for theft.  In discussing that offense while offering related exhibits, the State said:

> State's Exhibit Number 17 is an indictment for the offense of engaging in organized criminal activity, and the offense that most people understand was committed was a theft, alleged to have been committed with three or more people. That's what makes it an engaging, but that case was reduced, and she was allowed to plead to theft, $750 to $2,500.  She was given one day confinement in the county jail.

Exhibit 17 was Calhoun's indictment for that offense, exhibit 18 was the written plea admonishments and plea agreement, and exhibit 19 was the judgment.

In its initial closing, reading the jury charge, the State told the jury that it could recommend community supervision only if certain requirements were met, one being that the

15

jury must "find that the defendant ha[d] never been convicted of a felony in this or any other state." The State then said,

> I could stand up here and argue about how you shouldn't believe her mother's testimony, and it's not really been proven beyond a reasonable doubt.[4]  I'm not going to do that.  She's not a convicted felon.  If you want to give her probation, you can.

But the State argued against community supervision:  "We do want you to sentence her to prison."

Calhoun, naturally, asked the jury to assess community supervision as its punishment. Among other arguments, Calhoun urged community supervision as an opportunity for rehabilitation.  In so doing, Calhoun's trial counsel specifically mentioned the prior theft offense: "[Calhoun's] mother told you that she has never been convicted of a felony before, but we know she's got a conviction for theft, a couple of resisting arrests[,] and all this activity in term[s] of fighting with police when they confront her."

The State revisited the prison versus community supervision theme in its final closing, saying,

> Look at her prior criminal history.  She's not been to prison before.  She's had several prior cases where her charges were reduced.  She walked away with only fines or time served.  Each time she was given leniency, either a slap on the wrist, shown grace, shown mercy, and every single time she's gone right back to her criminal behavior.  She has spit in the face of this community, the community that has shown her so much leniency over the years.  It shows why probation is inappropriate.  She keeps doing the same things.  It's a cycle, and enough is enough.

---

[4]Calhoun's mother, Latonya Knighten, testified that Calhoun had been arrested in the past but had never "been convicted" of a felony in this state or any other state.

16

Against this backdrop, during its deliberations, the jury sent out its question referring to exhibits 17 and 18 and asking whether organized crime is a felony.

Calhoun argues, "By giving the jury an exhibit for which they did not ask (State's Exhibit-19, the judgment of conviction of Calhoun, which shows the reduced sentence and time served of one day) and then explaining its significance, the Trial Court impermissibly commented on the weight of the evidence." Examining first Calhoun's position that giving the jury exhibit 19 in response to their question was improper, we note that the only reasons Calhoun claims error are that exhibit 19 shows the reduced sentence and time served of one day. But exhibit 18, the plea admonishments and plea agreement, shows the same—it notes Calhoun faced a punishment range for a misdemeanor rather than a felony and it shows her sentence to be one day's confinement in the county jail. Thus, even if the trial court erred in giving the jury exhibit 19 along with the exhibits they referenced, exhibits 17 and 18, doing so did not cause the egregious harm Calhoun must show. *See id.*

We turn, then, to Calhoun's claim that "explaining [exhibit 19's] significance," that is, making the statement that "[t]he case was filed as a felony but resolved as a misdemeanor," constituted an impermissible comment on the weight of the evidence. "A trial judge improperly comments on the weight of the evidence if he makes a statement that (1) implies approval of the State's argument; (2) indicates any disbelief in the defense position; or (3) diminishes the credibility of the defense's approach to the case." *Nguyen v. State*, 506 S.W.3d 69, 83 (Tex. App.—Texarkana 2016, pet. ref'd) (quoting *Joung Youn Kim v. State*, 331 S.W.3d 156, 160

17

(Tex. App.—Houston [14th Dist.] 2011, pet. ref'd) (plurality op.)). The trial court's answer to the jury did none of these.

Both the State and Calhoun mentioned in closing that Calhoun had never been convicted of a felony, and that fact was central to both their positions. The State urged that Calhoun should not be treated with leniency this time around, as she had been in the past, and Calhoun claimed she was entitled to community supervision because of her no-prior-felony-conviction status.

Simply providing exhibits 17 and 18 could have led to confusion, as the indictment was for engaging in organized criminal activity, which the plea admonishments identified as a felony. Yet, the admonishments also said the charge was being reduced to theft, and Calhoun would receive punishment in the class-A-misdemeanor range. Further, a simple "yes" answer to the jury's question whether organized crime was a felony also might have misled the jury, possibly making them think Calhoun was not entitled to community supervision.

By more fully answering the jury's question, the trial court merely repeated the prior-felonies issue that both parties addressed during the punishment phase of trial, accurately stating the procedural posture of Calhoun's prior offense. Doing so did not "(1) impl[y] approval of the State's argument; (2) indicate[] any disbelief in the defense position; or (3) diminish[] the credibility of the defense's approach to the case." *See id.* (quoting *Joung Youn Kim*, 331 S.W.3d at 160). The trial court's communication to the jury in response to its question was not an impermissible comment on the weight of the evidence.

We overrule Calhoun's third issue.

18

## V.   Conclusion

We affirm the trial court's judgment.

Jeff Rambin
Justice

Date Submitted:   May 28, 2025
Date Decided:    July 14, 2025

Do Not Publish